919 So.2d 112 (2005)
Kenneth Eugene STAGGS, Jr., Appellant
v.
Lynn Allison Gulledge STAGGS, Appellee.
No. 2004-CA-00443-COA.
Court of Appeals of Mississippi.
May 24, 2005.
*114 Lisa B. Milner, Jackson, attorney for appellant.
David Edwin James, Marty Craig Robertson, attorneys for appellee.
Before KING, C.J., CHANDLER and BARNES, JJ.
CHANDLER, J., for the Court.
¶ 1. After Lynn Staggs Kudisch moved with her children and her new husband to Maryland, Ken Staggs filed suit for custody of the children. Lynn counterclaimed and requested an increase in child support. The Lauderdale County Chancery Court denied Ken's request to change custody and granted Lynn's request for child support. Ken appeals, raising the following issues:
I. WHETHER THE CHANCELLOR ERRED IN REFUSING TO GRANT A CHANGE OF CUSTODY OF KENNY
II. WHETHER THE CHANCELLOR ERRED IN INCREASING KEN'S CHILD SUPPORT OBLIGATIONS
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. Kenneth Eugene Staggs, Jr. ("Ken") and Lynn Allison Gulledge Staggs Kudisch, both medical doctors, were divorced on July 6, 1999, in Lauderdale County, Mississippi. The Lauderdale County courts have maintained jurisdiction throughout the parties' litigation. Ken continues to live in Lauderdale County. The parties agreed that Lynn would be the primary physical custodian of the parties' three children. The children are Kenneth Eugene Staggs, III ("Kenny"), born June 27, 1993; Savannah Rose Staggs, born January 26, 1995; and Isabelle Marie Staggs ("Belle"), born October 13, 1997.
¶ 4. In January of 2001, Lynn moved with the children to Hattiesburg because of a new job opportunity. Because of this move, Ken attempted to modify custody, and he later negotiated a settlement with Lynn, which expanded Ken's visitation privileges and granted Ken extensive visitation time during the summer months.
¶ 5. In May of 2001, Lynn was arrested for prescription forgery. After this arrest, she realized that she also needed help for her excessive consumption of alcohol. She entered her rehabilitation treatment on June 27, 2001. She signed a "Recovery Contract Agreement" with the Mississippi Recovering Physicians Program on September 10, 2001. When Ken learned that Lynn had been arrested, he filed a second custody modification suit. After a trial, the chancellor denied Ken's request for a change of custody based on the lack of a showing of a material change of circumstances.
¶ 6. Jeff Kudisch, Lynn's current husband, is a college professor. Jeff accepted a teaching position at the University of Maryland in August of 2002. He moved to Ellicott City, Maryland, a suburb of Baltimore, at that time. Lynn and Jeff were engaged in October of 2002. Before the wedding, Lynn and the children made several trips to Maryland in order to help the children adjust to their new home. While they were there, Lynn and Jeff slept in the same bed, even though the chancellor had instructed Lynn not to do so. In March of 2003, Lynn obtained a license to practice medicine in Maryland and signed a contract with the Maryland Physicians Recovery Program. This contract is set to expire on September 10, 2006. On July 18, 2003, Lynn and Jeff married. Lynn and the children moved to Ellicott City in August.
¶ 7. Ken believed that the children, especially Kenny, were having trouble adjusting *115 to life in Maryland and alleged that a custody modification was warranted on those grounds. Accordingly, he filed his third request for a modification of custody. Lynn counterclaimed and requested an increase in child support. A trial was held from October 27 to October 30, 2003, and the chancellor denied Ken's request to change custody. The evidence at the trial showed that Savannah and Belle have nicely adjusted to their new home in Maryland, and the chancellor also found no material change of circumstances that would warrant a change of Kenny's custody. On appeal, Ken requests custody of Kenny only.
¶ 8. Ken alleges that Kenny has experienced increased anxiety and depression as a result of the move. Ken avers that Kenny has expressed his true feelings to his father and to Kenny's therapist, Dr. Ken Schneider. Ken believes Kenny has experienced stomachaches and headaches as a result of his stressful situation at home with Lynn. According to Ken, Kenny is concerned about his mother and the possibility of her relapse into drug abuse. Kenny believes his mother puts her own needs over his needs. Kenny is resentful of being deprived of participating in extra-curricular activities and sports. Ken believes Kenny is unable to tell his mother his true feelings because Kenny is concerned that it would upset her.
¶ 9. Ken asserts that he has a closer relationship with Kenny than Kenny has with Lynn. According to Ken, Kenny relies on his father for stability; to discuss topics such as life, religion, and "what it means to be a man;" and to alleviate his worries. Kenny testified at trial and expressed a desire to live with his father, and Ken argues that his wish should be honored.
¶ 10. The chancellor granted Lynn's request for an increase in child support and increased Ken's monthly obligation from $2,000 to $2,500. The chancellor found that an increase in child support was warranted based on the fact that the children's needs increased because they are older, based on the higher cost of living in Maryland, and based on a substantial increase in Ken's income since the time of the divorce. Ken complains that Lynn failed to prove that an increase in child support was warranted. Ken believes that the true reason for Lynn's need for increased child support was Lynn and Jeff's purchase of a $750,000 home in Maryland.

ANALYSIS

I. WHETHER THE CHANCELLOR ERRED IN REFUSING TO GRANT A CHANGE OF CUSTODY OF KENNY
¶ 11. When a parent requests a change of custody, he must show by a preponderance of the evidence that, since the entry of the last decree sought to be modified, there must be a material change in circumstances that adversely affects the welfare of the child. Ash v. Ash, 622 So.2d 1264, 1266 (Miss.1993). Once the party has shown that an adverse change has occurred, the party must show that the best interest of the child requires the change of custody. Pace v. Owens, 511 So.2d 489, 490 (Miss.1987). This Court may reverse a chancellor's decision only if it is manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard. Brocato v. Brocato, 731 So.2d 1138, 1140(¶ 8) (Miss.1999).

(A) Whether the testimony of Dr. Ken Schneider proved a material change of circumstances
¶ 12. In his appeal, Ken relies heavily on the testimony of Dr. Ken Schneider, who first evaluated Kenny in February of 2003. The chancellor accepted Dr. Schneider, who holds a PhD in *116 psychology, as an expert psychologist in the field of child and adolescent therapy. Dr. Schneider saw Kenny on February 28, March 28, May 27, June 10, June 26, July 3, July 10, July 28, July 30, and October 4, 2003. He also held two telephone conferences. Dr. Schneider's opinions on Kenny were formed based on his interviews of Kenny. Dr. Schneider evaluated Kenny to make a diagnosis and not to give a custody opinion.
¶ 13. Dr. Schneider testified that he observed signs of depression and anxiety in Kenny when he first met with Kenny on February 28. He concluded that Kenny was concerned about a possible move away from Mississippi that would separate him from his father and that his mother had broken a promise to him by moving to Hattiesburg and then planning a move to Maryland. After Kenny's first meeting with Dr. Schneider, Dr. Schneider diagnosed Kenny with an adjustment disorder with mixed features of depression and anxiety. Six months later, he changed the diagnosis because the time one can have an adjustment disorder expired, and he provided a diagnosis of depression.
¶ 14. Dr. Schneider opined that Kenny's anxiety was related to the acrimonious relationship between his parents, the separation from his father, his feeling that he had to look out for his mother, and the feeling that she did not have his best interests as paramount. The prime source of Kenny's anxiety, according to Dr. Schneider, is his separation from his father. The separation from his father causes Kenny to experience feelings of hopelessness.
¶ 15. Another source of anxiety was Kenny's observations of the interaction between his stepbrother Josh and his stepfather Jeff. Kenny had heard Jeff speaking to Josh harshly, and he witnessed frequent arguments, with Jeff sometimes punishing Josh in a physical manner. Jeff disciplines Josh approximately every other day.
¶ 16. A third source of Kenny's anxiety, according to Dr. Schneider, is the litigation, because Kenny is very interested in the outcome of the litigation because he wants to live with his father. Kenny is a sensitive person who loves both his parents and strives not to hurt the feelings of either parent. Kenny is careful to avoid comparisons about his father and mother, and he does not say that one parent is better than the other parent. Nevertheless, Kenny has conveyed his true feelings to his father and to Dr. Schneider that he would prefer to live with his father. Kenny has requested the help of his father and Dr. Schneider to attain this outcome. The net result of Kenny's anxiety, according to Dr. Schneider, is that Kenny is in an "arrested development." Kenny has made some adjustments to his school and living arrangements in Maryland, but he is not settled into his new life.
¶ 17. According to Dr. Schneider, Kenny related that he felt anxious about his mother's well-being and he felt distrust for her. Although Kenny knows that his mother loves him, he did not feel that she showed a great deal of interest in what Kenny thought aside from issues surrounding homework. Kenny feels that his mother's insistence that Kenny complete his homework each night was a kind of pressure to perform in a way that pleases her. Kenny was concerned that his mother would get in trouble again with the law and was worried about her when she came home late. Kenny has described his mother in favorable terms and he says that he loves his mother. However, he also mentions his lack of trust and anxieties with respect to his relationship with mother. Kenny feels anxious about saying something that would make his mother feel bad, and he feels that he is responsible for her.
*117 ¶ 18. One major reason Kenny feels that he is unable to trust his mother is that Kenny feels that he has not received accurate information from her. He believes that she broke promises to him that have affected his trust in her. In particular, Kenny is resentful that his mother did not tell him about her alcoholism. In school, Kenny learned that recovering alcoholics will always remain alcoholics, and Kenny is concerned for his mother for this reason. Kenny is also resentful that his mother moved to Maryland even though Kenny said he would be much happier in Hattiesburg and despite the fact that she told him they would stay in Hattiesburg forever.
¶ 19. Kenny is interested in participating in extracurricular activities, including karate, soccer, and other sports. His mother informed him that the family would not have time for such activities in Maryland, and his inability to play sports contributes to his resentment of his mother.
¶ 20. Although Kenny was ten years old at the time of trial and not of sufficient age by law to state a custodial preference, Dr. Schneider testified that Kenny is able to state his intentions and preferences. His cognitive ability is well above normal for a person his age, and he is able to comprehend the consequences of living with one parent over the other.
¶ 21. Some of Dr. Schneider's conclusions were refuted by the testimony of Mr. Paul Davey, the expert psychologist hired by Lynn who also evaluated Kenny. Mr. Davey held several counseling sessions with the three Staggs children in preparation for the 2002 custody trial, and he was accepted as an expert in that trial. He had a follow-up session with the children on August 8, 2003, as the children were preparing for the move to Maryland, to see how the children were doing. The court accepted Mr. Davey as an expert in counseling for the 2003 trial. Kenny gave no indications to Mr. Davey of a lack of trust in his mother. He observed Kenny and Lynn "interacting openly and freely." He also observed no evidence that Kenny considered himself to be a caretaker for his mother. According to Mr. Davey, Kenny was not afraid of the move to Maryland but did not want to leave his friends in Hattiesburg and make new friends in Maryland. Mr. Davey opined that Kenny's nervousness was the result of the ongoing litigation and not his move to Maryland. He was nervous about the litigation because he knew it would have a prolonged effect on where he would live. Mr. Davey observed that Kenny and his stepfather have a good relationship, and that he was best friends with his stepbrother Josh. Mr. Davey recognized that Kenny was a gracious child who wanted to please both of his parents. Mr. Davey opined that Kenny was not mature enough to consider the consequences of a change in custody.
¶ 22. Mr. Davey disagreed with Dr. Schneider's conclusion that Kenny is in an "arrested development." Mr. Davey did observe that Kenny was guarded due to his separation from his father, his separation from his friends, and the court litigation. However, Mr. Davey did not see any indication of anxiety or terror in Kenny, but simply "typical adjustment reactions to a move." At the time of the trial, Kenny had been living in Maryland for only two months. The only reason Kenny was not allowed to participate in after-school programs was that his mother recognized that he first needed to adjust to life in Maryland. Mr. Davey defended Lynn's decision to delay Kenny's participation in extra-curricular activities until the family settled into their new home in Maryland. He acknowledged the importance of allowing Kenny to see other children participating in extra-curricular activities during his *118 transition. Mr. Davey stated, "I see every indication that he is a functional child who has maintained his academic record, who has maintained his academic work through his moves that he has had to make and the single best predictor of present and future behavior is past behavior." He also concluded, "He has made move adjustments before and resolved the reactions of that move."
¶ 23. Mr. Davey never asked Kenny whether he worried about his mother, whether he was upset about not being able to participate in extra-curricular activities, whether he felt his mother listened to him, or whether he could talk to his mother openly. Ken argues that such an omission indicates that Dr. Schneider's expert testimony is more reliable than Mr. Davey's expert testimony. Ken is essentially asking this Court to accept Dr. Schneider's testimony as paramount and to reject Mr. Davey's testimony. This Court is unable to make such an evaluation. Powell v. Ayars, 792 So.2d 240, 243(¶ 6) (Miss.2001) (citing Chamblee v. Chamblee, 637 So.2d 850, 860 (Miss.1994)).

(B.) Whether the chancellor erred in refusing to separate Kenny from his siblings
¶ 24. The chancellor denied Ken's request for a change in custody, in part, because he held that the best interests of all three children would be served by keeping the children together. The chancellor cited Mixon v. Bullard, 217 So.2d 28, 30-31 (Miss.1968), where the Mississippi Supreme Court stated, "The Court shall in all cases attempt insofar as possible, to keep the children together in a family unit. It is well recognized that the love and affection of a brother and sister at the ages of these children is important in the lives of both of them and to deprive them of the association ordinarily would not be in their best interest." Absent unusual and compelling circumstances, it is presumed that the best interests of the children would be served by keeping the siblings together. Brawley v. Brawley, 734 So.2d 237, 241(¶ 12) (Miss.Ct.App. 1999).
¶ 25. The chancellor recognized that it is not a per se rule to keep siblings in the same household, and that the best interests of the children are always of paramount concern. Id. (citing Bowen v. Bowen, 688 So.2d 1374, 1380 (Miss.1997); Sellers v. Sellers, 638 So.2d 481, 484 (Miss.1994); Franklin v. Kroush, 622 So.2d 1256, 1256 (Miss.1993); Arnold v. Conwill, 562 So.2d 97, 100 (Miss.1990); Sparkman v. Sparkman, 441 So.2d 1361, 1362-63 (Miss.1983)). Ken argues that this case is replete with evidence that Kenny should be separated from his siblings and that Kenny alone should be in the custody of his father.
¶ 26. In the case sub judice, there was no testimony regarding how Kenny's separation from his siblings would affect Savannah, Belle, or Kenny. Dr. Schneider admitted that he could not make any meaningful custody determinations concerning Savannah and Belle and he could not opine as to what effect the separation would have on any of the three children. Kenny initially testified that he would not miss his sisters if he lived with his father, but he later admitted that he would miss them "a little." Kenny testified that he had not thought about where his sisters would live if he were to live with his father. Mr. Davey testified that the three Staggs children are close to each other and interact well with each other.
¶ 27. Contrary to Ken's assertions, the evidence is not overwhelming that Kenny's problems would be solved if he lived with his father. Kenny testified that he would miss his mother, Jeff, and Josh if he lived with his father. Kenny stated that his *119 mother takes good care of him. His mother assigns chores for him and sets rules with respect to what television shows he can watch, what movies he can see, and what video games he can play. While Ken is an agnostic and testified that religion is not important to him, Lynn testified that religion is very important to her. While Kenny has acted reserved and guarded since moving to Maryland, Kenny behaved in the same way when he lived in Hattiesburg. Such evidence supports a finding that there was no material change in circumstances adverse to Kenny's well-being. As the chancellor quoted in his opinion from the case of Spain v. Holland, 483 So.2d 318, 320-21 (Miss.1986):
We need [sic] be clear what we mean by the phrase "adverse effect." These children have already been adversely affected by the inability of their mother and father to live together which led to the 1983 divorce. Beyond this, most children of divorced parents will be further adversely affected if the two parents are living in the same town at the time of the divorce and either subsequently moves thousands of miles away. Where such occurs we solve nothing by shifting custody to the parent staying at home for, in theory at least, a transcontinental separation from either parent will adversely affect the child. The judicial eye in such cases searches for adverse effects beyond those created (a) by the divorce and (b) by the geographical separation from one parent.
¶ 28. One constant source of conflict between Kenny and Lynn is that Kenny feels pressured by Lynn's insistence that Kenny complete his homework each night. However, Dr. Schneider opined that Kenny's stress about homework is about the same, if not worse, at his father's house. Dr. Schneider acknowledged that Kenny is in the gifted program at his school in Maryland and that his grades have remained excellent.
¶ 29. While Lynn acknowledges that Kenny is close to his father, the record shows that he also relies on his mother for guidance and that his mother endeavors to help Kenny in any way she can. Lynn testified that Kenny has always come to her whenever he was sad or scared. Lynn testified that Kenny told her about an "accident" he had at the hotel before he testified and asked her for help. Before sending Kenny to bed each night, she asks Kenny how his day was.
¶ 30. Ken implies that Lynn's parenting skills are deficient because she was arrested for prescription forgery. He also asserts that Lynn's parenting skills are deficient because she did not have an Alcoholics Anonymous sponsor in Maryland at the time of the trial. Lynn had been sober for twenty-eight months at the time of the trial. At the parties' first custody trial, two physicians testified that Lynn's prognosis was excellent. Lynn has been released from probation, she remains in full compliance with her rehabilitation contract, and her license to practice medicine in Maryland is not restricted in any way. Ken also believes Lynn should be penalized for leaving Mississippi in 2002 without permission from her probation officer. Lynn admitted that it was a mistake for her to leave the state without such permission, and she testified in a deposition and at trial that the incident was a misunderstanding which was resolved.
¶ 31. Ken further implies that Lynn's parenting skills were deficient for sleeping in the same bed with Jeff during the 2002 Thanksgiving holidays and the week before the wedding. However, Ken was guilty of the same misconduct, and in the chancellor's opinion following the first custody trial, he went into great detail cataloguing the pre-marital cohabitation of *120 Ken and his current wife. In his opinion following the custody trial that is the subject of this appeal, the chancellor acknowledged Lynn's conduct and stated, "The petitioner and the respondent have participated in relationships outside marriage that question his/her moral fitness. Marriage has eliminated any such conduct and the moral fitness factor does not favor the petitioner or the respondent."
¶ 32. Finally, Ken asserts that Lynn lacks parenting skills because she leaves the children in the care of her next door neighbors in the afternoons for three or four days per week while Lynn is working. Ken cites McBride v. Cook, 858 So.2d 160 (Miss.Ct.App.2003) for the proposition that custody should be changed when a mother allows other people to provide primary care for her children. McBride is distinguishable from the case sub judice. In McBride, Ms. McBride left her child with the child's grandparents for days at a time while Ms. McBride acted as the primary caregiver for a male friend whom she eventually married. Id. at 162(¶ 5). Ms. McBride was gone from her child for such an extended period of time that this Court described Ms. McBride's relationship with her child as a "lack of traditional parental involvement." Id. By contrast, Lynn leaves her children in the care of her next door neighbors only during the afternoons while she is at work. Many working mothers use daycare services, and the use of such services does not indicate a lack of traditional parental involvement.
¶ 33. The chancellor was within his discretion in giving consideration to the fact that Kenny should remain with his siblings if at all possible. Ken produced no evidence showing what effect Kenny's separation would have on Kenny, Savannah or Belle. The evidence shows that Kenny would adjust to living in Maryland if given time, and the chancellor was within his discretion in finding Lynn's parenting skills of Kenny to be adequate. In short, the chancellor was within his discretion in his finding of no unusual and compelling circumstances that would justify separating Kenny from his siblings.

(C) Whether the chancellor erred in not honoring Kenny's preferences
¶ 34. The chancellor determined that Kenny, although still in his tender years at the time of trial, was competent to testify. See Mohr v. State, 584 So.2d 426, 431 (Miss.1991); M.R.E. 601. He gave this testimony outside the presence of either parent. Kenny was questioned on direct, cross, and redirect examinations. Although a child of any age may be allowed to testify, a child must be at least twelve years old before he is allowed to state a custodial preference. Miss.Code Ann. § 93-11-65(1)(a) (Rev.2004). Nevertheless, Ken argues that the chancellor erred in not considering Kenny's preferences because it was part of what he considers irrefutable proof that Kenny's best interests would be served by being in the custody of his father.
¶ 35. Kenny testified that it is difficult for him to talk to either parent about his true feelings because he does not want to hurt the feelings of either parent. However, it is more difficult for Kenny to talk about his feelings to his mother. It is especially difficult for Kenny to tell his mother he would rather live with his father, because he does not want to hurt his mother's feelings. He continued to state that he was upset that his mother did not tell him about her drug and alcohol use and that she had told him they were going to stay in Hattiesburg when they moved there. These two situations affected Kenny's trust in his mother. Kenny stated that he does not know why the family left Hattiesburg and that he does not trust his mother because of the move.
*121 ¶ 36. Kenny testified that he felt that his mother was "a little" selfish because of their move to Maryland. Kenny also testified that he is resentful that he has not participated in any extra-curricular activities in Maryland because his mother informed him that they were "too busy getting into the new house and everything." His mother informed him that he will start playing sports in Maryland when the family settles into their new life.
¶ 37. Kenny testified that he missed his father "a lot" while living in Maryland and that if he lived with his father, his father could teach him sports and "how to do stuff and life." Kenny and his father talk about "what is going on in life, how to deal with things and everything." Kenny testified that he is not able to have such conversations with his mother. Lynn and Jeff let Kenny call his father any time he wishes.
¶ 38. Ken avers that Kenny has been very insistent about wanting to live with his father. Kenny has testified that he told his mother's attorney that he wanted to live in Mississippi. He stated that he was afraid that he was going to hurt his mother's feelings by testifying at the hearing. He stated that he has previously told his mother that he wanted to live with his father. However, when the chancellor asked Kenny which parent he would prefer, Kenny was less than emphatic. Kenny initially testified that his preference would be to spend six months of each year with each parent. When he realized that he had to choose one parent over the other, he stated, "I guess-I guess with my dad, I guess, a little bit more." Kenny later explained that his preference to live with his father was between "a lot more" and a "little bit more."
¶ 39. Ken believes that Kenny's headaches and stomachaches were caused by the anxiety Kenny feels due to his stressful home situation in Maryland. However, Kenny testified that his headaches have gotten better since he moved, and that he experienced his stomachache the night before he testified because he was nervous.
¶ 40. Ken argues that Kenny is overwhelmingly anxious about Lynn's drug use, and that this concern should mandate a change of custody. Ken's reliance on this part of Kenny's testimony is misplaced. Kenny did testify he was concerned about his mother's drug use when they lived in Hattiesburg and when Lynn came home late, because he was concerned that she got lost or that she might take drugs. However, he now very rarely worries that his mother might take drugs. He worries less about his mother now, because he knows that Jeff can take care of her. Lynn told Kenny that she was getting help for her situation and that she was doing it to make herself better for him. Kenny stated that he felt better after his mother had this conversation with him.
¶ 41. Ken also argues that Kenny's testimony regarding the allegedly violent conflict between Jeff and Josh should warrant a change in custody. Ken exaggerates this part of Kenny's testimony. Kenny acknowledged that Josh is turning into a teenager and that teenagers get into arguments with their parents. Kenny indicated that he knows how to cope with the situation and leaves the room to do something else when they argue. Kenny testified that Josh can be very dramatic and can overreact to situations. Kenny testified that he does not believe Jeff is mean to Josh and that Jeff does not use excessive force when he spanks Josh. Kenny also testified that Jeff is very nice to him. While Kenny was "a little nervous" about Lynn's proposed marriage to Jeff, he is now "okay" with the marriage now that they are actually married.
*122 ¶ 42. Although the chancellor acknowledged that Kenny would prefer to live with his father, the chancellor held that Kenny had not maturely or responsibly considered the consequences of this preference. Ken argues that Kenny's preference should be honored. He relies in part on the Wheeler Intelligence Scale Test administered by Dr. Schneider when Dr. Schneider concluded that Kenny was capable of giving a preference. He also cites Bell v. Bell, 572 So.2d 841 (Miss.1990) for the proposition that Kenny's preference should have been considered. The child making the selection in Bell was thirteen. Id. at 846. Kenny was ten years old at the time of the trial and by law not of sufficient age to state a preference. Although Kenny is clearly very intelligent, our laws do not allow children under the age of twelve to state a preference, and our laws make no exceptions for precocious children. Moreover, in Bell the Mississippi Supreme Court acknowledged that a chancellor is not bound to honor custodial preferences of children even when they are over the age of twelve. Id.
¶ 43. The chancellor was within his discretion in not following Kenny's custodial preference. Ken submits that the overwhelming weight of Kenny's testimony proves that a change of custody is warranted because he is depressed and anxious, because he is not having his needs for extra-curricular activities addressed, and because his mother ignores his needs. However, the record supports a finding that Kenny is currently in a stable, safe, and comfortable environment, that his needs are being met, and that there was no material change of circumstances adverse to Kenny's well-being.

II. WHETHER THE CHANCELLOR ERRED IN INCREASING KEN'S CHILD SUPPORT OBLIGATIONS
¶ 44. A chancellor's findings on domestic relations will not be disturbed on appeal unless the chancellor was manifestly wrong, clearly erroneous, or applied an inappropriate legal standard. Sumrall v. Munguia, 757 So.2d 279, 282(¶ 12) (Miss. 2000). This is particularly true in the areas of divorce, alimony, and child support. Id. (citing Tilley v. Tilley, 610 So.2d 348, 351 (Miss.1992); Nichols v. Tedder, 547 So.2d 766, 781 (Miss.1989)).
¶ 45. Ken testified that since starting his new business venture in December of 2001, his patient load has increased and his business has prospered. Ken makes $52,300 in gross monthly income, which is a $627,600 gross yearly income. Since the last child support determination, Ken's gross yearly income has increased by the sum of $214,800.
¶ 46. Lynn earned a salary of $145,000 per year as a physician in Hattiesburg. Lynn accepted a new position as a physician in Maryland with a base salary of $150,000 per year, with a possibility of an annual bonus. Jeff earns a salary of $88,000 per year and supports his two children on this salary. Together, the couple earns $238,000 per year. A salary calculator introduced into evidence at trial reveals that a person earning $150,000 in Hattiesburg would need to earn $203,400 in Ellicott City, Maryland.
¶ 47. Jeff and Lynn purchased a $750,000 house in Ellicott City. Ken argues that his increased child support obligations, in effect, require him to pay for the mortgage on this house, for which he should not be held financially responsible. Jeff testified that it was important for the Staggs-Kudisch household to live in a good neighborhood with access to good schools. Lynn testified that the house was approximately the same size as her old home in Hattiesburg. The estimated monthly payment on the house, including principal, interest, insurance, and taxes, is approximately *123 $4,400. Jeff testified that a house in Mississippi of similar quality would sell for about $250,000.
¶ 48. Lynn's expense statement revealed that her net monthly expenses were $11,225. She estimated that these expenses would increase to $11,818 in March, 2004, when the family expected to move into their new home. This amount includes a monthly payment for legal fees in the amount of $2,000 and the monthly payment on the home. Lynn's monthly expenses in October of 2001 were $7,847. Lynn and Jeff acknowledged that Jeff pays some of the family's living expenses, including medical insurance for Lynn and all three of the Staggs children.
¶ 49. Jeff and Lynn both testified with regards to the increase in the cost of living in Ellicott City as opposed to Hattiesburg. Jeff discussed the increase in school costs in Ellicott City as opposed to Hattiesburg due to computer labs, additional books and different school supplies such as $100 calculators. Jeff stated, "Everything else, the cost of groceries is more expensive, going out, the gas, across the board it's more expensive to live there." Lynn also testified that the cost of food, gas, and housing are all more expensive in Ellicott City than in Hattiesburg.
¶ 50. In addition to the increase in the cost of living, Lynn discussed the increase in prices for clothes and shoes now that the children are older and have new desires and interests. Lynn added that bicycles and toys are getting more technical and more expensive. She also stated that the cost of Belle's kindergarten is almost twice as expensive as it was when she was younger. The children take field trips at school nearly every other week, which incurs added expenses. Lynn commented on Savannah's interests in nicer clothing as opposed to the t-shirts she was once content wearing and Kenny's new interest in compact disc players and music. As the chancellor noted, Lynn's testimony relevant to the children's increase in expenses was unchallenged.
¶ 51. Based on the increase in Ken's income, the evidence of the increased cost of living, the increased needs of the children as they grow older, the chancellor increased Ken's monthly child support obligation from $2,000 per month to $2,500 per month, except during the months of June and July, when Ken has extended visitation with the children, when the child support obligation is $700.[1] This child support modification resulted in a net increase in Ken's child support of $450 per month, approximately 2.5 percent of his increase in income.[2]
¶ 52. Child support is subject to modification only when the moving party shows a material change in circumstances. Yancey v. Yancey, 752 So.2d 1006, 1009(¶ 9) (Miss.1999). As recognized by the chancellor, some of the factors relevant in deciding whether a material change has taken place include (1) increased needs caused by advanced age and maturity of the children (2) increase in expenses, and (3) the inflation factor. Other factors include (4) the relative financial condition and earning capacity of the parties, (5) the health and special needs of the child, both physical and psychological, (6) the health and special medical needs of the parents, both physical and psychological, (7) the *124 necessary living expenses of the father, (8) the estimated amount of income taxes the respective parties must pay on their incomes, (9) the free use of a residence, furnishings, and automobile and (10) such other facts and circumstances that bear on the support subject shown by the evidence. Adams v. Adams, 467 So.2d 211, 215 (Miss.1985) (citing Tedford v. Dempsey, 437 So.2d 410 (Miss.1983); McKee v. McKee, 382 So.2d 287 (Miss.1980); Brabham v. Brabham, 226 Miss. 165, 84 So.2d 147 (1955)).
¶ 53. A petitioner can demonstrate a material change in circumstances warranting modification of child support by showing that increased financial obligations have eaten away so significantly at the purchasing power of the existing child support award that it no longer meets the needs of the child. Turner v. Turner, 744 So.2d 332, 336(¶ 17) (Miss.Ct.App.1999). "This may be done by showing a significant increase in the cost of goods or services or by a specific showing of needs not previously existing." Id.
¶ 54. In Wright v. Stanley, 700 So.2d 274, 283 (1997), the Mississippi Supreme Court affirmed the chancellor's decision to increase the father's child support obligation when the chancellor stated that the increase in child support was based on the increase in the father's income, an increase in the cost of living, and an increase in the children's needs because they were getting older. Likewise, the chancellor was within his discretion in increasing Ken's child support obligation when Ken's income increased substantially, Lynn documented the higher cost of living in Maryland as opposed to Mississippi, Lynn demonstrated her monthly increase in expenses after she moved to Maryland, and the evidence that the children's expenses were increasing as they were getting older was undisputed.
¶ 55. THE JUDGMENT OF THE CHANCERY COURT OF LAUDERDALE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.
NOTES
[1] The prior child support order directed Ken to pay $500 per month in June and July.
[2] The chancellor found that the child support guidelines were inapplicable. See Miss.Code Ann. § 43-19-101(4) (Rev.2004). Under the child support guidelines, Ken would be required to pay twenty-two percent of his adjusted gross income, or approximately $11,500 per month.