913 So.2d 358 (2005)
Ricky Dewayne BEASLEY, Appellant,
v.
Andrea Annette BEASLEY, Appellee.
No. 2002-CA-02086-COA.
Court of Appeals of Mississippi.
April 19, 2005.
Jak M. Smith, Tupelo, attorney for appellant.
*359 Rhett R. Russell, Tupelo, attorney for appellee.
Before BRIDGES, P.J., MYERS and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. This appeal has been brought by the father of two minor children aggrieved that physical custody of his two children was modified by the Chancery Court of Lee County. There being no material change in circumstance in the custodial home or a finding that the actual custodial arrangement was detrimental to the well-being of the children as required in order to modify a custody decree, we reverse and render.

FACTUAL AND PROCEDURAL BACKGROUND
¶ 2. Ricky Dewayne Beasley (Ricky) and Andrea Annette Beasley (Andrea) were married on August 3, 1990, in Lee County, Mississippi. Ricky and Andrea had two children, Cameron Dewayne Beasley (Cameron), born June 16, 1993, and Katherine Camille Beasley (Camille), born September 11, 1995. Ricky and Andrea lived together, with their two children, in Lee County, Mississippi, until they separated in February of 1998 and filed for divorce on the ground of irreconcilable differences. The agreed-upon property settlement, submitted to the trial court in February of 1998, stated that Ricky and Andrea would have joint legal custody and Ricky would have full physical custody and control of Cameron and Camille. Andrea was given reasonable visitation as detailed in the agreement; the agreement further provided for Andrea to have visitation "[a]ny other times as agreed upon by the parties." The final divorce decree, dated April 28, 1998, awarded primary custody of the children to Ricky. At that time, Cameron and Camille were aged four and two, respectively.
¶ 3. For a period of time, the couple mutually agreed to allow Andrea visitation far more than the decree required. Up to August of 2001, the couple split their time with the children, each having the children two week nights and every other weekend. However, in August of 2001, Andrea moved from the town of Shannon to Saltillo, approximately twenty miles from Ricky's home. At that point, Ricky stopped agreeing to the liberal visitation and demanded that the parties abide by the final divorce decree. Even after she moved to Saltillo, Andrea enjoyed more visitation than was called for in the decree. The children were allowed to spend Sunday nights with Andrea on her weekends, and Andrea was able to pick the children up from school on Mondays and stay with them until Ricky got off work.
¶ 4. When Andrea tried to enroll the children in the Saltillo school district, she was told the school district required a court order providing that she had actual physical custody of the children before they could be enrolled. On August 1, 2001, Andrea filed her complaint for modification of the final decree, alleging there to have been a substantial and material change in circumstances since the entry of the final decree. She did not, however, identify that change in circumstance. A hearing was held in open court in the spring of 2002, at which both parties were present and represented by counsel. On May 29, 2002, Chancellor Mask issued an interim order, holding that Andrea had met her burden of proving a substantial and material change in circumstances and awarded her immediate custody. The chancellor did not, however, identify the change in circumstance. The decree of modification, issued on August 2, 2002, recited that the court "is of the opinion that *360 there has been a substantial and material change in circumstances that adversely affects the best interest of the children since the entry of the divorce decree," and ordered that primary care, custody and control of the two minor children be awarded to Andrea.[1] Again, the chancellor failed to identify the change in circumstance which justified modification of child custody. The chancellor, however, "reserve[d] making findings of fact and conclusions of law should either side elect to appeal."
¶ 5. On August 6, 2002, Ricky filed a motion to alter or amend judgment and for reconsideration based on Andrea's failure to prove that there had been a substantial and material change in circumstances. Ricky contemporaneously filed a motion for findings of fact and conclusions of law. In response, the court issued a memorandum opinion and an order denying the motion for reconsideration on November 14, 2002. In the memorandum opinion, the chancellor went through an analysis of the Albright[2] factors to determine that there had been a material and substantial change in circumstances that adversely affected the children and that it would be in the best interests of the children for Andrea to be awarded primary custody. The only negative circumstances identified by the court were that Cameron failed the second grade and had difficulties keeping up with his class even after he repeated the grade and that Cameron and Camille began having behavior problems in August 2001 and January 2002, respectively. The court noted that Cameron's behavior problems began "after Ricky took over his full time care in August 2001," thereby implying that Ricky might be responsible. Later, the court recognized that Cameron's behavior problems "[c]oincid[ed] with Andrea's move to Saltillo." Finally, the court found that "the relationship that the children have with Andrea is obviously very important to them, and the disruption of Andrea's custody since August 2001 has affected the children and seems to have caused behavior difficulties in both Cameron and Camille." Ricky timely filed his notice of appeal to this Court.

STANDARD OF REVIEW
¶ 6. The standard of review employed by this Court in domestic relations cases is well established and abundantly clear. Child custody matters are within the sound discretion of the chancellor. Sturgis v. Sturgis, 792 So.2d 1020, 1023(¶ 12) (Miss.Ct.App.2001). The standard of review employed in domestic relations cases is limited to the substantial evidence/manifest error rule. Mosley v. Atterberry, 819 So.2d 1268, 1272(¶ 16) (Miss.2002). This Court will not disturb the chancellor's findings unless the trial court was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. Cooper v. Ingram, 814 So.2d 166, 167(¶ 2) (Miss.Ct.App. 2002).

ANALYSIS
¶ 7. In order for child custody to be modified, the non-custodial party must prove: "(1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change of custody." Mabus v. Mabus, 847 So.2d 815, 818(¶ 8) (Miss.2003) (citing Bubac v. Boston, 600 So.2d 951, 955 (Miss.1992)). As to the first factor, "[t]he burden of proof is on the movant to show by a preponderance of the evidence that a material change in circumstances has occurred *361 in the custodial home." Mabus, 847 So.2d at 818(¶ 8) (citing Riley v. Doerner, 677 So.2d 740, 743 (Miss.1996)) (emphasis added); see also Johnson v. Gray, 859 So.2d 1006, 1014(¶ 37) (Miss.2003) (quoting Mabus); Hoggatt v. Hoggatt, 796 So.2d 273, 273-74(¶ 2) (Miss.Ct.App.2001) ("traditional requirement that a change of custody must be based on proof of a change in circumstance in the situation of the custodial parent detrimental to the child's interest").
¶ 8. This Court has emphasized that the request for modification
does not simply mean a re-weighing of the Albright factors to see who now is better suited to have custody of the child. Although a re-weighting of Albright factors may be triggered, in reviewing the circumstances, there must be shown, we reiterate, a material change not just a change in circumstances, that has had an adverse affect on the child and which requires, or mandates, a change in custody for the best interests of the child.
Sanford v. Arinder, 800 So.2d 1267, 1272(¶ 16) (Miss.Ct.App.2001). The supreme court has held that "[w]hile numerous factors may go into the initial consideration of a custody award, see, e.g., Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983), only parental behavior that poses a clear danger to the child's mental or emotional health can justify a custody change." Morrow v. Morrow, 591 So.2d 829, 833 (Miss.1991).

I. WHETHER THERE WAS A SUBSTANTIAL CHANGE IN CIRCUMSTANCES IN THE CUSTODIAL HOME
¶ 9. In accordance with the "traditional requirement" that a change of custody must be based on proof of a change in circumstances in the custodial home, as recently reiterated by the supreme court in Mabus and Johnson, Andrea has the initial burden of showing that there was a substantial change in circumstances in the custodial home which transpired between April of 1998 and August of 2001. See Mabus, 847 So.2d at 818 (¶ 8); Johnson, 859 So.2d at 1014(¶ 37). Ricky challenges the chancellor's methodology in utilizing the Albright factors to determine whether a change in circumstances had occurred. Quoting Sturgis v. Sturgis, 792 So.2d 1020, 1025(¶ 19) (Miss.Ct.App.2001), Ricky contends that the chancellor was required "to first identify the specific change in circumstances, and then analyze and apply the Albright factors in light of that change." Several months after Sturgis, this court held that "modification of custody is warranted in the event that the moving parent successfully shows that an application of the Albright factors reveal that there has been a material change in those circumstances which has an adverse effect on the child and a modification of the custody would be in the child's best interest." Sanford v. Arinder, 800 So.2d 1267, 1272(¶ 18) (Miss.Ct.App.2001).[3] The court emphasized, however, that the chancellor is not simply to re-weigh the Albright factors to see who now is better suited to have custody; the factors must evidence that a material change has occurred in the custodial home. Id. at 1271-72 (¶¶ 13, 16).
¶ 10. In the instant case, we find that although the chancellor properly reviewed the Albright factors to determine whether a material change in circumstances had occurred; the court failed to recognize *362 that the material change must have been in the custodial home. Nowhere in the memorandum opinion does the chancellor mention a change in the custodial home. While the chancellor did not specifically identify what she considered to be the material change in circumstance,[4] she discussed two issues. First, a review of the lower court's Albright analysis reveals that behavior problems the children exhibited after August 2001 is the most recurrent issue. The court noted that Cameron's behavior problems began "after Ricky took over his full time care in August 2001," thereby implying that Ricky might be responsible. However, the court later recognized that Cameron's behavior problems "[c]oincid[ed] with Andrea's move to Saltillo" and that "the disruption of Andrea's custody since August 2001 has affected the children and seems to have caused behavior difficulties in both Cameron and Camille." After careful review of the record, we are unable to find a correlation between Cameron's behavioral problems and the custodial home. Deborah Sharp, a support therapist at Shannon Elementary School who works with Cameron, testified that Cameron's behavioral problems stemmed from his problems accepting female authority. Further, a school report addressing Cameron's behavior, which was signed by seven teachers as well as Andrea and Ricky, stated that, "Cameron's disability is not due to cultural, environmental factors, economic disadvantages of limited English proficiencies." No testimony contradicted these findings.
¶ 11. Secondarily, the chancellor discussed Cameron's difficulty in completing the second grade. When asked to identify the material change in circumstances at trial, Andrea responded, "I think with Cameron going into special ed and not doing good in school and having behavioral problems, if we don't  why I think that they need to be with me and have better help in school so that there will be no certain material change of circumstance.... Plus they need to be with their mom." In essence, Andrea's response affirmed that there had not yet been any material change in circumstance. Cameron's unsuccessful first attempt at the second grade occurred while Andrea was living nearby and enjoying the liberal visitation agreed to by the parties; Cameron's second, successful, attempt occurred when Andrea was residing twenty miles away and having less visitation. Andrea even testified that, in her opinion, the reason Cameron failed the second grade was because the children were going back and forth between parents each night.[5] Based upon the findings of the *363 chancery court and our review of the record, we are unable to conclude that the behavior problems are attributable to a substantial or material change in circumstances in the custodial home, that is, Ricky's home. The only changes were Andrea's move to a town twenty miles away and Ricky's decision to enforce the terms of the custody order as entered.
¶ 12. Andrea argues that "the true custody agreement was not one and the same as set out in the property settlement agreement and subsequent final decree of divorce.... The true custody agreement was that they had joint physical custody." Andrea cites to the chancellor's reference to "the disruption of Andrea's custody since August 2001." (emphasis added). In White v. Thompson, 822 So.2d 1125, 1128(¶ 8) (Miss.Ct.App.2002), this Court determined that a custody agreement entered into between the parties but never endorsed by a court of law did not have binding legal force so as to alter the analysis to be followed by the court in determining custody. In the instant case, the chancellor's reference to "Andrea's custody" appears to be unintentional; the court recognized that "[i]n order to change custody from a previous Order, the moving party must show that there has been a material change in circumstances...." Additionally, in White, the same chancellor properly recognized that although the parties acted as if their agreement was binding, the agreement was not a custody order which could affect the court's custody analysis. Id. In the instant case, there was only one custody order entered, that which awarded Ricky custody and incorporated an agreement which permitted the parties to allow more liberal visitation to the non-custodial parent. Accordingly, the custodial home for the purposes of the modification analysis is Ricky's home. The chancery court failed to identify any substantial or material change in circumstances in the custodial home so as to require or justify modification of custody, and our review of the record does not reveal such change.

II. WHETHER RILEY V. DOERNER SUPPORTS THE CHANCELLOR'S DECISION TO MODIFY CUSTODY
¶ 13. In addition to reciting the requirement that a material change in circumstances must be shown, and purporting to find such a change, the chancery court cited Riley v. Doerner, 677 So.2d 740, 744 (Miss.1996), for the proposition that "the totality of the circumstances can be considered in rare instances where the two prong test does not serve the child's best interest." Andrea quotes Riley:
The test we have devised for custody modification need not be applied so rigidly, nor in such a formalistic manner so as to preclude the chancellor from rendering a decision appropriate to the facts of an individual case. In particular, it should not thwart the chancellor from transferring custody of a child from one parent to another when, in the chancellor's judgment, the child's welfare would be best served by such transfer.
See Riley, 677 So.2d at 745. We find the reliance on Riley misplaced. The court in Riley was confronted with a mother engaging in continued illegal drug use while having custody of her children. The court found evidence that even though no change in circumstance had occurred (as the mother was using drugs when the custody was *364 originally awarded), the custodial home was the site of dangerous and illegal behavior sufficient to justify a modification of custody. Riley, 677 So.2d at 744. Andrea's reliance on Riley fails to appreciate the supreme court's actual holding that "when the environment provided by the custodial parent is found to be adverse to the child's best interest, and that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly." Riley, 677 So.2d at 744. This Court reads Riley
narrowly as having some application in those situations where the existing custodial arrangement has shown itself to be actually detrimental to the child's well-being and the non-custodial parent can, by virtue of subsequent improvement in that parent's overall situation, demonstrate that he or she offers an alternative custodial arrangement beneficial to the child that did not exist at the time the original custody determination was made.
Hoggatt v. Hoggatt, 796 So.2d 273, 275(¶ 9) (Miss.Ct.App.2001).
¶ 14. We do not conclude that the instant case represents one of the rare situations Riley was intended to address. The trial court did not find the existing custodial arrangement to be detrimental to the well being of Cameron or Camille. In fact, the chancellor's Albright analysis reflects that both Ricky and Andrea "love their children and have a willingness and desire to provide primary care," that both parents attend church regularly and take the children to church when the children are in their custody, and that "the children have a normal, loving relationship with both parents." The chancellor specifically found Ricky's home to be "very stable, as he has been employed at the same place for nine years and still lives in the same home since the divorce." The school report signed by seven teachers as well as Andrea and Ricky, stated that, Cameron's problems were "not due to ... environmental factors." Deborah Sharp confirmed that both of Cameron's parents had been very cooperative. The chancery court did not find the custodial home to be an environment adverse to the children's best interests so as to justify modification of custody without a substantial change in circumstances. Based upon the chancellor's Albright findings and our review of the record, neither do we.

CONCLUSION
¶ 15. For the reasons discussed above, we find that the trial court erred in failing to identify the specific material change in circumstance in the custodial home. Without the finding of such a material change or a finding that the actual custodial arrangement was detrimental to the well-being of the children, we cannot affirm the modification of custody. We reverse the decision of the chancellor as to the custody of the children and future obligations of child support.
¶ 16. THE JUDGMENT OF THE LEE COUNTY CHANCERY COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO APPELLEE.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR.
NOTES
[1] The court ordered Ricky to pay child support, equal to twenty percent of his adjusted gross income.
[2] Albright v. Albright, 437 So.2d 1003 (Miss. 1983).
[3] Sanford was cited with approval by the Mississippi Supreme Court in Johnson v. Gray, 859 So.2d 1006, 1013(¶ 33) (Miss.2003).
[4] Having analyzed each of the factors, the chancellor concluded "[u]pon review of the Albright factors, this Court finds that there has been a material and substantial change in circumstances that adversely affects Cameron and Camille and in viewing the totality of the situation, it would be in the best interest of both children that Andrea be awarded the primary care, custody and control of Cameron and Camille."
[5] While not cited by either party, we find Ingram v. Ingram, 814 So.2d 166 (Miss.Ct.App.2002) to be distinguishable. In Ingram, we affirmed the chancellor's modification of custody where the material change in circumstance was the custodial parent's insistence on following her own unsuccessful method in tending to the child's academic needs and her refusal to consider expert recommendations. 814 So.2d at 168 (¶¶ 3-4). While the instant trial court commended Andrea's "proactive" attempts to arrange tutoring for Cameron, the court made no determination that Ricky's attitude or actions with respect to Cameron's education was adverse to the child's best interests. Upon review of the record, we note that Deborah Sharp confirmed that both Ricky and Andrea had been very cooperative in regard to Cameron's education. Although Andrea testified that she had talked to a Saltillo teacher about tutoring Cameron if the judge gave her custody, Ricky testified that Andrea had never talked to him about getting Cameron a tutor, but that he had considered it himself and was willing to get Cameron a tutor at his expense. Ricky further testified that he "had mentioned something about a tutor, and [Andrea] said that she could tutor him," so he "just left it alone." His testimony was not contradicted by Andrea.