929 So.2d 414 (2006)
Mary McDaniel Morrison SAVELL, Appellant
v.
Robert Lee MORRISON, Appellee.
No. 2004-CA-02231-COA.
Court of Appeals of Mississippi.
May 23, 2006.
*416 Melissa Lee Day Gardner, Brandon, attorney for appellant.
Thomas Dale Beavers, attorney for appellee.
Before LEE, P.J., GRIFFIS and ROBERTS, JJ.
ROBERTS, J., for the Court.

PROCEDURAL HISTORY
¶ 1. The parties, Mary Savell (Mary) and Robert Morrison (Robert), were divorced on April 16, 1999, having one child of the marriage, Mary Anna Morrison (Anna), born July 19, 1995. As per the Dissolution Agreement, Mary was awarded primary physical custody of Anna with legal custody shared jointly between Mary and Robert.
¶ 2. At the conclusion of Anna's summer visitation with her father in 2003, Robert filed a Motion for Modification of Custody citing Mary's then unmarried cohabitation with Roger Savell (Roger). On June 15, 2003, Robert was awarded temporary legal and physical custody of Anna while the parties awaited trial on Robert's motion. At the November 20, 2003 hearing, Robert's case was dismissed for lack of showing a material change in circumstances, partly as a result of Mary and Roger getting married shortly before trial began. As a result, the chancellor returned custody to Mary.
¶ 3. On June 1, 2004, Robert filed a petition seeking custody of Anna and was awarded sole legal and physical custody of Anna with the lower court's final judgment of modification entered on August 12, 2004. Mary now appeals and makes her sole assignment of error the trial court's modification of custody of Anna. The judgment of the trial court is affirmed.

FACTS
¶ 4. Subsequent to the 1999 divorce, both Robert and Mary remarried, with Mary remarrying twice. In 2000, Mary married Keirk Reisenbichler but later divorced in the fall of 2003, and, as noted above, shortly before the November 20, 2003 hearing, Mary's third marriage was to Roger. Robert was married in 2000, to Rebecca Morrison (Rebecca). In addition to Anna, the Morrisons have two children, one of whom is Robert's stepchild. Testimony at trial indicated that Anna and her siblings got along well when she was in the custody of her father.
¶ 5. Subsequent to the 2003 hearing Anna was returned to the Savell household in December 2003, after her school term ended for the calendar year. As the lower court pointed out, this would mark the first time Anna would live with Roger and her mother as husband and wife. What would follow over the next several months would show a pattern of obscene language and threats of violence directed at Anna by Roger. These incidents would be brought to light through the testimony of Rebecca and the introduction of a recorded phone conversation she had with Roger two days after the November 2003 trial. In addition to events detailed during the conversation between Rebecca and Roger, testimony given during trial indicated that Roger used obscenities regularly and he stated during the taped conversation that he would use the word "f____" in his home whenever he wanted.
¶ 6. During the conversation with Rebecca, Roger indicated that he was prepared to go to jail in the event that he "snapped" and whipped Anna. Roger also confirmed that he hollered "I don't give a f____ what you like" when Anna asked him to turn down the car radio. In fact, Roger indicated that it was his belief, after talking to *417 an attorney, that he could yell at Anna whenever he wanted. He apparently took advantage of this advice when he admitted that he screamed at Anna on an almost daily basis. Additionally, Roger admitted that he wanted to repeatedly hit, or "pepper," Anna with paintballs and duct tape her to a chair. Finally, Roger threatened Anna with a belt as a result of her talking back to her mother, scaring Anna to the point that she turned white.

STANDARD OF REVIEW
¶ 7. Matters involving child custody are within the sound discretion of the chancellor. Sturgis v. Sturgis, 792 So.2d 1020(¶ 12) (Miss.Ct.App.2001). The standard of review utilized in domestic relations cases is governed by the substantial evidence/manifest error rule. Beasley v. Beasley, 913 So.2d 358(¶ 6) (Miss.Ct.App. 2005). Specifically, the lower court's decision will not be disturbed unless the decision of the trial court was manifestly wrong, clearly erroneous, or applied an incorrect legal standard. Lambert v. Lambert, 872 So.2d 679(¶ 18) (Miss.Ct.App. 2004).

ANALYSIS
¶ 8. When a change in custody is requested, the movant has the burden of showing, by a preponderance of the evidence that, there has been a material change in circumstances since the entry of the decree to be modified that adversely effects the child's welfare. Staggs v. Staggs, 919 So.2d 112(¶ 11) (Miss.Ct.App. 2005); Glissen v. Glissen, 910 So.2d 603(¶ 21) (Miss.Ct.App.2005). Additionally, the material change in circumstances must have come about in the custodial home. Mabus v. Mabus, 847 So.2d 815(¶ 8) (Miss.2003); Beasley, 913 So.2d at (¶ 7). Furthermore, if a material change that adversely effects the child is found, it must be determined that the best interests of the child will be furthered by the purported change in custody before the change can be granted. Staggs, 919 So.2d at (¶ 7). Finally, the trial court may not consider each element and factor in a bubble, but must weigh them all together and make a determination in consideration of the totality of the circumstances. Elliott v. Elliott, 877 So.2d 450(¶ 13) (Miss.Ct. App.2003).

I. WHETHER THE CHANCELLOR ERRED IN FINDING A MATERIAL CHANGE IN CIRCUMSTANCES.
¶ 9. Mary argues that the chancellor should have only considered those events that occurred after the November 20, 2003, trial when making the determination of whether or not there was a material change in circumstances. This is an incorrect application of the law. All events that have occurred since the issuance of the decree sought to be modified may be considered by the chancellor. In this instance, Robert sought to permanently modify the 1999, custody decree that awarded Mary primary physical custody of Anna. Therefore, the chancellor could have considered all evidence that may has been introduced at trial from that point through the end of trial. That being said, the chancellor did err in this respect, albeit harmless error, as the trial court did restrict its consideration of events to those that occurred after the November 30, 2003, trial.
¶ 10. While many factors are considered in the initial consideration of custody, see, e.g. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983), a request for modification does not simply give the petitioner another bite at the Albright apple. Beasley, 913 So.2d at (¶ 8). Post-divorce custody modification should only be entertained when it is shown that "parental behavior poses a clear danger to the child's *418 mental or emotional health." Id. (citing Morrow v. Morrow, 591 So.2d 829, 833 (Miss.1991).) What should not be considered is the non-custodial parent's visitation rights, or hindrance thereof, as they are legally irrelevant in custody matters unless interference with visitation has an adverse effect on the child or children in question. Balius v. Gaines, 908 So.2d 791(¶ 29) (Miss.Ct.App.2005).
¶ 11. In his opinion, the chancellor made clear that a material change in circumstances was shown from the evidence presented at trial. The trial court explained that its finding of a material change in circumstances was based on the facts that Mary denied Robert visitation on at least two instances, Roger's use of obscene language, and Roger's threats to harm Anna. While visitation should not have been considered in this case, Mary's marriage to Roger and Roger's subsequent treatment of Anna were well within the chancellor's sphere of consideration as they were changes in the custodial home. By his own admission, Roger yelled at Anna on an almost daily basis and at times directed obscenities towards her.
¶ 12. Mary argues that Roger never physically disciplined or struck Anna, and from this implies that no material change in circumstances can be found. Mary further argues that the evidence presented at trial, at most, shows that Roger used profanity in and out of the presence of Anna. Both arguments are without merit. First, physical abuse or discipline is simply not required for the chancellor to find a material change in circumstances. Surely, physical abuse or excessive discipline would be a heavy factor to be considered within the totality of the circumstances, but it is not required. Secondly, Roger is guilty of much more than the simple use of profanity, as the chancellor pointed out in his opinion. Roger indicated that he did not care if he went to jail or not in the event that he physically disciplined Anna. Added to the facts that Roger has threatened Anna with physical discipline to the point that she turned white with fear and his desires to "pepper" her with paintballs and duct tape her to a chair indicate an increasing level of aggression, which the chancellor identified. Taken as a whole, we cannot say that the chancellor was manifestly wrong or clearly erroneous in his determination that there had been a material change in circumstances.

II. WHETHER THE CHANCELLOR ERRED IN FINDING A FUTURE POSSIBILITY OF ADVERSE EFFECTS.
¶ 13. Normally, it must be shown that a material change in circumstances in the child's custodial home has a present adverse effect on the child or is detrimental to the child. Our supreme court has indicated that in limited circumstances adverse effects exist if it is shown that it is reasonably foreseeable that the child will suffer adverse effects because the child's present custodial environment is clearly detrimental to his or her well being. Johnson v. Gray, 859 So.2d 1006(¶ 39) (Miss.2003); Glissen, 910 So.2d at (¶ 25). The Johnson court applied language from Riley v. Doerner, 677 So.2d 740 (Miss.1996), in holding that the chancellor may satisfy the "adverse effects" finding required in custody modification by finding reasonably foreseeable adverse effects if the child continues in the adverse environment. Johnson, 859 So.2d at (¶ 39). Additionally, this Court has stated that the chancellor need not wait for the minor child to actually be injured before finding an adverse effect. Glissen, 910 So.2d at (¶ 25). Specifically, "when the environment provided by the custodial parent *419 is found to be adverse to the child's best interest, and that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly." Riley, 677 So.2d at 744 (emphasis in original). In Glissen, this Court interpreted Riley and determined that Riley "allow[s] a chancellor to modify child custody if the chancellor reasonably foresees that children will be harmed by a change in the custodial parent's lifestyle." Glissen, 910 So.2d at (¶ 25).
¶ 14. The Riley court stated, in situations in which no material change in circumstances can be shown a chancellor does have the power to, nonetheless, order a change in custody. Riley, 677 So.2d at 744. This alternative standard should only be applied when the child's health and welfare are truly at risk, but "in such rare cases, no rigid test or magic words should stand in the way of the chancellor as he or she acts to improve the child's welfare through a modification of custody." Id. at 745.
¶ 15. To be clear, the facts at hand do not rise to the high, alternative standard of custody modification dictated in Riley that would allow the movant to bypass the required showing of a detrimental, material change in circumstances. That being said, this is a case in which the chancellor was within his discretion to find reasonably foreseeable adverse effects based on the child's environment and best interests, thus satisfying that element of the traditional custody modification analysis.
¶ 16. As in any custody modification determination, the polestar consideration is the well being of the minor child. Elliott, 877 So.2d at (¶ 13) (citing Sellers v. Sellers, 638 So.2d 481, 485 (Miss.1994)). In light of this, a chancellor's hands should not be shackled by a minor child's resilience to harm or ability to remain unscathed despite living in an adverse home environment. Riley, 677 So.2d at 744. Robert had remarried since the initial custody decree and he and Rebecca subsequently had a child in addition to Rebecca's child. Testimony at trial indicated that Anna enjoyed her sibling's company when she spent time with her father. Taken together with the chancellor's finding that the Savell household was adverse to Anna's well being, we conclude that the chancellor was not manifestly wrong or clearly erroneous when he found reasonably foreseeable adverse effects.
¶ 17. Mary argues that Robert never produced any evidence of adverse affect on Anna as a result of the material change in circumstances that was shown. This is accurate, as the chancellor pointed out in his opinion, but under these facts it was not required. Being subjected to an almost constant barrage of yelling and profanity does not a healthy and happy child make. This may or may not have produced the adverse environment Anna experienced during her stay at the Savell household but when added to the facts that Roger had already threatened her with physical punishment, had desires to "pepper" her with paintballs and bind her to a chair with duct tape, and his admitted willingness to go to jail if he "snapped," an adverse effect on the child was just a matter of time. As noted above, and obvious to all, a child's welfare is paramount.
¶ 18. Upon our review of the record, we can find no manifest error or clear error committed by the lower court or abuse of discretion of the chancellor's part. The judgment of the Chancery Court of Madison County, therefore, is affirmed.
¶ 19. THE JUDGMENT OF THE MADISON COUNTY CHANCERY *420 COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.