BARNES, J.,
 

 for the Court:
 

 ¶ 1. Shelby Beason moved for modification of custody of his and Candice Beason Sullivan’s minor children. The chancellor granted the modification of custody, awarding physical custody of the children to Shelby and granting visitation to Candice and requiring her to pay child support
 
 *707
 
 for the children. Aggrieved by the chancellor’s decision, Candice appeals. Finding no error, we affirm.
 

 FACTS
 

 ¶ 2. On February 9, 2005, the Neshoba County Chancery Court granted Candice and Shelby a divorce on the ground of irreconcilable differences. The judgment of divorce incorporated the parties’ separation and property settlement agreement, which gave primary physical custody and care of their two minor children, Cole and Micaela, to Candice. The property settlement agreement was not included in the record for our review. However, the chancery court took judicial notice of the divorce judgment and property settlement agreement at trial.
 

 ¶ 8. On December 5, 2007, Shelby filed a motion to modify custody in the Neshoba County Chancery Court. Shelby’s motion alleged that a material change in circumstances had occurred in Candice’s home which had adversely affected Cole and Mi-caela. Specifically, Shelby alleged that Candice failed to provide a stable home for the children and was morally unfit to retain custody of the children. Shelby requested that the chancery court grant him sole legal and physical custody of the children, allowing Candice only restricted visitation with the children. On December 6, 2007, Shelby filed a motion for temporary relief, seeking custody of the children while his motion to modify custody remained pending. The chancery court granted the temporary change in custody, finding that a material change in circumstances had occurred in Candice’s home which was adverse to the children. The temporary custody order gave Shelby custody of the children and restricted Candice’s visitation. The temporary order prohibited Candice from visiting with the children in her home.
 

 ¶ 4. Candice filed an answer and defenses and a motion to dismiss in response to Shelby’s motion to modify custody. Additionally, Candice filed a counter-complaint for contempt and modification, arguing that Shelby had failed to meet his support obligations for the children and that custody of the children should be returned to her. The chancery court held a hearing of the matter over three days — February 25, 2008, and June 12-13, 2008.
 

 ¶ 5. At the conclusion of the hearing, the chancery court issued a bench opinion continuing the temporary custody arrangement, lifting the restrictions on Candice’s visitation with the children, and taking the matter under advisement. On August 29, 2008, the chancery court issued a written opinion denying Candice’s motions and granting Shelby’s motion to modify custody. The chancellor found that a material change in circumstances had occurred since the entry of the judgment of divorce and custody agreement. After finding a material change in circumstances, the chancellor reviewed the evidence and conducted an analysis of the evidence pursuant to
 
 Albright v. Albright,
 
 437 So.2d 1003, 1005 (Miss.1983). The chancery court granted custody of the two minor children to Shelby and allowed Candice visitation. The chancery court removed the restrictions previously imposed on Candice’s visitation.
 

 ¶ 6. Candice argues on appeal that the chancellor erred in finding that a material change in circumstances had occurred in her home and that any such change had had an adverse impact on the children.
 

 STANDARD OF REVIEW
 

 ¶ 7. On appeal, this Court will not disturb a chancellor’s factual findings regarding custody modification unless the chancellor’s findings are “manifestly wrong, clearly erroneous, or the proper
 
 *708
 
 legal standard was not applied.”
 
 Duke v. Elmore,
 
 956 So.2d 244, 247 (¶ 6) (Miss.Ct.App.2006).
 

 DISCUSSION
 

 ¶ 8. When seeking a modification of child custody, the noncustodial parent must prove that: a material change in circumstances has occurred in the custodial parent’s home since the most recent custody decree, the material change adversely affects the child, and a modification of custody is in the best interest of the child.
 
 Giannaris v. Giannaris,
 
 960 So.2d 462, 467-68 (¶ 10) (Miss.2007). Any change in custody must be predicated on the conduct of the custodial parent that poses a danger to the mental or emotional health of the child.
 
 Id.
 
 at 467 (¶ 9) (quoting
 
 Morrow v. Morrow,
 
 591 So.2d 829, 838 (Miss.1991)). The chancellor must consider the totality of the circumstances when determining whether a material change in circumstances has occurred.
 
 Creel v. Cornacchione,
 
 831 So.2d 1179, 1183 (¶ 15) (Miss.Ct.App.2002) (citing
 
 Ash v. Ash,
 
 622 So.2d 1264, 1266 (Miss.1993)). Further, the party seeking the modification of custody bears the burden of proving by a preponderance of the evidence that a material change in circumstances has occurred in the custodial home.
 
 Mabus v. Mabus,
 
 847 So.2d 815, 818 (¶ 8) (Miss.2003) (citing
 
 Riley v. Doerner,
 
 677 So.2d 740, 743 (Miss.1996)).
 

 ¶ 9. The chancellor reviewed testimony from nineteen witnesses before determining that a material change in circumstances adverse to the children’s well-being had occurred in Candice’s home. Specifically, the chancellor noted that the home environment Candice created for the children was “dysfunctional and hostile,” and Candice’s conduct since the divorce was “immoral.” The chancellor found the father’s home a more suitable and stable environment for the children.
 

 ¶ 10. In support of his position that a material change in circumstances had occurred in Candice’s home since the divorce, Shelby presented testimony from eleven witnesses, including himself. The witnesses consisted of the children’s grandparents and teachers, Candice’s former romantic interests, and others from their community who knew Candice and the children. These witnesses revealed a series of relationships Candice had after her divorce from Shelby which the chancellor found to have an adverse impact on the children.
 

 ¶ 11. First, Shelby presented the testimony of Billy Todd, whom Candice was dating at the time of her divorce from Shelby. Billy testified that he stayed overnight at Candice’s home when the children were present, approximately three nights per week. Billy testified that he would always leave before the children awoke in the morning. Billy also testified that he maintained his own residence and did not live with Candice and the children, as Shelby suggested. However, the chancellor found in his opinion that “the testimony is abundantly clear, not only through Mr. Todd, but through the testimony of Shelby Beason, that Mr. Todd was living with [Candice] in the presence of the minor children.”
 

 ¶ 12. Following her relationship with Billy, Candice began dating and, only a few months later, married Levi Sullivan. Levi testified that he and Candice often fought in front of the children. Levi noted that Micaela sometimes cried after Levi and Candice argued; however, Levi testified that he and Candice fought so often that the children “got to where they really didn’t seem like it was [a] big deal anymore.” In addition to their frequent fighting, Levi admitted that he had threatened
 
 *709
 
 to Mil himself when Candice refused to speak with him during the collapse of their marriage. During one incident, while Candice and the children were visiting Levi’s grandparents, Levi arrived at his grandparents’ home distraught that Candice would not speak with him. Levi threatened to Mil himself and then fired a gun into the air outside the home. Candice called the police after the incident, and Levi was arrested. Candice then obtained a restraining order against Levi, During another incident, Levi jumped onto Candice’s car with the children inside after an argument regarding parking arrangements in their driveway. Candice admitted that Levi’s actions frightened the children, but she claimed the children were not adversely affected by the incidents. However, Candice testified that the children were unable to attend school the day after the incident because they were so upset.
 

 ¶ 13. Candice called her father, Blake Warren, to testify on her behalf. Blake testified that Candice had called him to come to her house during a particularly volatile argument between herself and Levi. Candice also called on members of Levi’s family to come to the home to calm Levi down during this particular episode. Additionally, Candice called police officers to the house. Blake testified that when he arrived at Candice’s home he found physical damage to the house. Blake testified that the state of the house prompted him to check on the children to make sure they were okay. Blake testified that the children were asleep when he checked on them. Further, Blake stated that there were no physical injuries to either Candice or Levi, but he noticed that a mirror was broken, a door leading to the outside had been broken off its hinge, a glass cabinet door had been broken, and a telephone had been thrown through a Sheetrock wall. According to Blake, Levi caused the damage to the home. Despite Levi’s destruc-five outbursts, Candice did not immediately end her relationship with him.
 

 ¶ 14. While still married to Levi, Candice became involved with Calvin Johnson, a married man she knew from church. Calvin’s wife, Angela Johnson, testified that while she and Calvin were separated, she photographed his vehicle at Candice’s house late at night and early in the morning. Levi also testified that he had seen Calvin’s vehicle at Candice’s home late at night or early in the morning when the children were home, but presumably asleep. Calvin and Candice both deny that they were ever involved in a sexual relationship, even though both admitted that they had kissed once outside Candice’s home when the children were asleep.
 

 ¶ 15. Testimony at trial also revealed that Candice’s home environment was unstable. Candice’s utilities had been dis: connected because of her failure to pay her bills. Levi testified that Candice was always rushed, and she occasionally failed to provide proper meals for the children. Kathy Beason, Shelby’s mother, worked as a teacher at Neshoba Central Elementary School where both Cole and Micaela attended school. Candice would often drop the children at school early because she had to be at work before their school day started. Kathy allowed the children to stay in her classroom until school began. Kathy testified that on one occasion, Cole and Micaela arrived without having had breakfast. Candice had sent frozen Lean Cuisine dinners for the children to eat for breakfast.
 

 ¶ 16. Shelby also offered evidence that Candice, who is a registered nurse, failed to provide proper medical care for the children. Cole suffers from asthma and allergies, for which he takes prescription medications. The medication prescribed for Cole controls his symptoms; however,
 
 *710
 
 he has sneezing fits and other symptoms if the medication is not administered. Shelby’s wife, Marlow Beason, testified that Candice often forgot to send Cole’s medication with him when he would visit. Further, Marlow testified that she noticed when Candice did remember to send the medication, she could tell from the number of pills remaining in the prescription bottle that Candice had failed to give Cole the medication as prescribed. Cole’s teacher, Emmy Majure, testified that Cole would have sneezing fits in her classroom occasionally, and that these fits interrupted Cole’s learning. Candice testified that she relied on samples from Cole’s physician, explaining why the prescription bottle was often more full than Marlow expected. Further, Candice explained that she would put the medication by Cole’s breakfast each morning, but she was not sure whether he took his medication every day. The chancellor found that this failure to monitor whether Cole took his prescribed medication had an adverse effect on Cole because it had a direct impact on Cole’s schoolwork.
 

 ¶ 17. Additionally, Shelby alleged that Candice failed to seek medical treatment for Cole after he complained of chest pains at school. Cole visited the school nurse after telling his teacher about the pain. The school nurse sent a note home with Cole, which Candice claims she did not receive until the following day, after Cole had already informed his father of the pain. When Shelby learned of Cole’s chest pains, he immediately took him to see a pediatrician. The pediatrician was unable to find any cause for Cole’s chest pains. Candice testified that Cole suffered
 
 from
 
 constipation, and she believed his “chest pains” were in fact stomach pains.
 

 ¶ 18. Shelby testified that when Candice learned that Shelby was taking Cole to a physician in Meridian to investigate the chest pains, Candice became angry with Cole for telling Shelby about the note from the school nurse. However, Candice testified that Cole has trouble with constipation and gas and often will not tell someone when he needs to use the restroom. In response to Cole’s receiving medical treatment for the chest pain, Candice told Cole that he should not be allowed to go to his father’s deer camp that weekend since he was sick enough to see a doctor. Despite Candice’s explanation for not seeking medical treatment for Cole, the chancellor found that Candice’s attitude toward Cole’s health issue was adverse to Cole’s best interest.
 

 ¶ 19. Shelby also offered testimony from Cole’s teacher, Sylvia Pope, that Candice’s home environment was chaotic. Pope, who taught Cole at Neshoba Central, testified that while Cole lived with Candice, he was consistently late for school. Pope testified that she documented at least eighteen tardies during the first semester of school. She testified that Cole seemed frustrated that he missed instruction time. According to Pope, Cole’s tardiness caused him to rush through his work in order to catch up to his classmates, causing him to give incorrect answers. Pope testified that Cole performed very well in school, but she felt he was not meeting his full potential in reading. Pope testified that after she met with Candice regarding Cole’s tardiness, the situation improved. Candice explained that the car-rider lane at the school was often backed up, which caused her to arrive at the school after classes had already begun. Further, Candice stated that she was not aware that the teachers started class instruction at 7:50 a.m., rather than 8:00 a.m. Pope conceded that she was not aware of the school’s official start time.
 

 ¶ 20. Candice argues that Shelby has failed to show that any of the changes or
 
 *711
 
 problems in her home have had a negative impact on the children; therefore, he has failed to meet his burden of proof for a modification of custody.
 
 See Powell v. Powell,
 
 976 So.2d 358, 361 (¶ 11) (Miss.Ct.App.2008). Nearly all of the witnesses who testified at the custody-modification hearing stated that Cole and Micaela were well-behaved, well-mannered, and sweet-natured children. None of the witnesses could point specifically to any mental or emotional problems suffered by the children as a result of living in Candice’s home. However, Majure, who was Cole’s teacher at the time of the modification hearing, testified that Cole seemed more prepared and organized with regard to his schoolwork since being placed in his father’s custody.
 

 ¶ 21. Candice and her father both testified that Cole and Micaela remained asleep during the violent fight between Candice and Levi and were, therefore, unaffected by the argument and ensuing chaos. The chancellor found this testimony unreliable, stating: “Such testimony concerning the children is hard to believe with all the evidence of the violence, property destruction, and numerous people present in the middle of the night.”
 

 ¶ 22. The chancellor also found Candice’s testimony that the children were not adversely impacted by the incident where Levi jumped onto the hood of Candice’s car troubling. The chancellor stated: “While the court has serious doubts that such an incident would not upset young children, an ability to seem unaffected by such domestic discord does not make the home environment any more suitable to their welfare.... Violent episodes of this kind between parents clearly have an adverse effect on children, and the fact that they were not able to attend school the next day is evidence that Cole and Micaela were adversely affected.”
 

 ¶ 23. In
 
 Savell v. Morrison,
 
 929 So.2d 414, 419-20 (¶ 19) (Miss.Ct.App.2006), this Court affirmed a chancellor’s modification of child custody from a mother to a father based on a change in circumstances in the mother’s home. In
 
 Saveli,
 
 the minor child, Anna, was yelled at almost daily by her step-father, whose own testimony revealed an aggressive tendency toward the child.
 
 Id.
 
 at 418 (¶ 12). The Court noted the child’s resilience to the change in her mother’s home while acknowledging that “an adverse effect on the child was just a matter of time.”
 
 Id.
 
 at 419 (¶ 17). Citing
 
 Riley,
 
 677 So.2d at 744, this Court held that in light of this Court’s polestar consideration of the best interest of the child, “a chancellor’s hands should not be shackled by a minor child’s resilience to harm or ability to remain unscathed despite living in an adverse home environment.”
 
 Savell,
 
 929 So.2d at 419 (¶ 16).
 

 ¶ 24. Additionally, Candice argues in her brief that there has been no material change in circumstances in her home because Shelby admitted that he knew of her relationship with Billy at the time of the divorce and custody agreement. However, Shelby could not have anticipated the parade of men that Candice would bring into her and the children’s home. Furthermore, while Candice may have been cohabiting with Billy at the time of her divorce from Shelby, her subsequent marriage to Levi, whose violent tendencies led to a volatile and chaotic home environment for the children, clearly constituted a material change in circumstances. There is ample evidence in the record to support the chancellor’s determination that a material change in circumstances had occurred in Candice’s home since her divorce from Shelby. Moreover, even if Candice’s living situation remained unchanged since the entry of divorce, Shelby presented evidence that his living situation had im
 
 *712
 
 proved dramatically since the divorce and that a change in custody was appropriate.
 
 See Riley,
 
 677 So.2d at 744.
 

 ¶ 25. In
 
 Riley,
 
 the supreme court affirmed a chancery court’s modification of custody of a child from her mother to her father.
 
 Riley,
 
 677 So.2d at 745. Responding to the chancellor’s statement in his ruling that he felt constrained from considering the child’s best interest by the framework for a custody modification, which required an initial finding of a material change in circumstances in the custodial home, the supreme court stated the following:
 

 when the environment provided by the custodial parent is found to be adverse to the child’s best interest, and that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly.
 

 Id.
 
 at 744. Additionally, the supreme court stated:
 

 The test we have devised for custody modification need not be applied so rigidly, nor in such a formalistic manner so as to preclude the chancellor from rendering a decision appropriate to the facts of an individual case. In particular, it should not thwart the chancellor from transferring custody of a child from one parent to another when, in the chancellor’s judgment, the child’s welfare would be best served by such transfer.
 

 Id.
 
 at 745.
 

 ¶ 26. Candice’s divorce from Levi was finalized in June 2008. Candice argued before the chancellor that her divorce from Levi makes it unlikely that there will be any further violent incidents or any adverse impact on the children. However, the chancellor noted that Levi and Candice have a child together, which will necessitate that Levi and Candice continue to have contact. The chancellor found a “strong potential” for future problems between Candice and Levi. Furthermore, the chancellor found that the testimony at the hearing revealed that Candice had established “a pattern of infidelity and cohabitation in the presence of her minor children, along with the habit of living in a dysfunctional environment full of violence and immorality from the time of the divorce until the present with her minor children.”
 

 ¶ 27. Taking all of the evidence presented at the hearing together under the totality of the circumstances, the chancellor found a material change in circumstances had occurred in Candice’s home since the entry of the divorce judgment and that the change has adversely affected Cole and Micaela. We cannot find that the chancellor was manifestly wrong, clearly erroneous, or that he applied an improper legal standard when he considered the custody modification. Substantial evidence in the record exists to support the chancellor’s decision. Accordingly, we find this issue is without merit.
 

 ¶ 28. THE JUDGMENT OF THE NESHOBA COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, ISHEE, ROBERTS AND MAXWELL, JJ„ CONCUR. CARLTON, J., NOT PARTICIPATING.