# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-01198-COA

**DANNAH BRENTS**                                                                    **APPELLANT**

**v.**

**ALVA BLAKE HOLLAND**                                                             **APPELLEE**

DATE OF JUDGMENT:               10/04/2024
TRIAL JUDGE:                          HON. STEPHEN TRAVIS BAILEY
COURT FROM WHICH APPEALED:   PONTOTOC COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:       JOHN S. GRANT IV
                                          BROOKE TRUSTY GRANT
ATTORNEY FOR APPELLEE:          JAK McGEE SMITH
NATURE OF THE CASE:             CIVIL - CUSTODY
DISPOSITION:                       AFFIRMED - 04/21/2026
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Dannah Brents appeals a judgment of the Pontotoc County Chancery Court that modified custody of her two minor children, awarding joint legal custody but sole physical custody to Alva Blake Holland, the father, and conditional supervised visitation to Dannah. After reviewing the record, arguments of counsel, and relevant precedent, we affirm the chancery court's judgment concerning the child custody modification.

## FACTS AND PROCEDURAL HISTORY

¶2.     Dannah and Blake were in a romantic relationship from December 2019 until March 2022, but they never married. They are the parents of two minor children: daughter TFH,

born in August 2020, and son ABH, born in October 2022.[1]  Dannah also had custody of her older son from a previous relationship, LB, who is deaf.  Prior to the current custody dispute, Dannah and the children resided in Pontotoc, Mississippi.  Blake resided in Rapid River, Michigan.

¶3.    On December 16, 2022, Dannah filed a "Complaint to Establish Paternity, Child Custody, and Related Relief" in the Chancery Court of Pontotoc County.  On May 5, 2023, the chancery court entered an agreed order, adjudicating Blake as the father, awarding joint legal custody, and awarding "primary" physical custody of the two children to Dannah.  Blake was given holiday and summer visitation and ordered to pay $650 per month in child support.    Due to the distance, Blake and Dannah were to meet at the Miner Police Department in Sikeston, Missouri, to exchange the children for visitation.  Both parents also had the right to FaceTime with the children on Sundays and Thursdays from 6:30 p.m. until 7:00 p.m.  In August 2023, TFH began preschool; ABH was not yet enrolled in school.  The children lived near Dannah's family and enjoyed frequent visits with grandparents, cousins, and other relatives.

¶4.    In October 2023, Dannah started dating Kyle Corbett.  The relationship lasted until late January 2024.  Kyle lived with his mother, Virginia Feathers, in Waterford, Mississippi, and worked four days a week as a cook at a restaurant in Memphis, Tennessee, getting off around 11:00 p.m.

---

[1] Initials are used to protect the privacy of the minor children.

¶5.     In January 2024, after not hearing from Kyle the previous night, Dannah drove approximately an hour to Kyle's mother's house in Waterford to "check on Kyle." She left the children with her mother. She was at Kyle's residence for approximately two hours. While there, Dannah looked in Kyle's cellphone and discovered that he had been involved with another woman. Dannah argued with Virginia and cursed at her. Dannah and Kyle left Virginia's home and drove in separate vehicles back to Dannah's home.

¶6.     Dannah had been prescribed Vilazodone for depression and one pill a day of Klonopin for anxiety. Shortly after leaving Virginia's residence, while driving back to her home in Pontotoc, Dannah ingested more than her required dosage of Klonopin, initially taking two pills, and then two at a time every few hours. Dannah first went to the residence of her mother, Jennifer Brents, and picked up ABH; then she and Kyle returned to her house. During the course of the day, Dannah ingested approximately ten to twelve Klonopins. Kyle saw Dannah take these pills, and he even handed her the pills at her request.

¶7.     That same afternoon, Dannah told Kyle that because he was unfaithful, she was going to "punish him" by going to see another man in Batesville. Dannah drove to Batesville, leaving one-year-old ABH in Kyle's care. Dannah returned around 8:30 p.m. and told him that she had performed various sexual acts with a man in Batesville. However, Dannah later testified that she did not do this and that she only told Kyle this in revenge for Kyle's infidelity.

¶8.     The next day, Kyle used Dannah's phone to record them having sexual relations.

3

Dannah denies giving Kyle consent to record them, and instead, she claims that Kyle secretly made this recording because he knew her cellphone password. However, Dannah admitted that ABH was in the residence when the sex video was made. The video was posted on Dannah's Snapchat and circulated to various people. Dannah alleges that Kyle's mother sent the video to Blake.

¶9.     Blake forwarded the sex video to Dannah's mother and grandmother. Then, he sent a text message to Dannah, saying: "have fun living down the embarrassment now that your mom and grandma both know what happened." Dannah responded, "I have nothing to be embarrassed about. You're just mad because he f*cks me better than you ever could."

¶10.     Later that day, Jennifer arrived at Dannah's residence and took ABH with her. Kyle agreed to drive Dannah to her parents' residence. While the vehicle was moving, Dannah attempted to open the car door. While at Dannah's parents' home, Kyle "bear-hugged" Dannah to prevent her from harming herself, and during her resistance, she bit and scratched him. Kyle testified that the children were present, but both Dannah and her mother testified that the children were with their great-grandmother, who was at the house with the children in another room.

¶11.     That same day, Dannah took a kitchen knife, barricaded herself in the bathroom, and threatened to harm herself. Dannah's father and Kyle were able to get to her and restrain her. Emergency services arrived and took Dannah by ambulance to the North Mississippi Medical Center emergency room. She was later admitted to a behavioral health facility and remained

there for two days.

¶12. On February 2, 2024, Blake filed a "Complaint for Relief under Rule 65, For Custody and Other Relief" in the original paternity case. Blake alleged that there had been a substantial material change in circumstances that adversely affected the children such that the agreed order of child custody should be modified, and he should be given sole physical custody of the children. He also sought a termination of his child support obligation and requested that an order be entered requiring Dannah to pay him child support. Blake alleged the following:

a. Dannah tried to jump out of a moving vehicle[.]
b. Dannah locked herself in a bathroom with knives and tried to commit suicide[.]
c. Dannah had to be removed by an ambulance and admitted to the hospital after her suicide attempt[.]
d. Dannah attacked her boyfriend, Kyle, biting and scratching him[.]
e. Dannah videotaped herself and Kyle having sexual relations, and posted the video to the internet[.]

Blake requested emergency physical custody and contended that Dannah should not receive any visitation or, alternatively, that she should only receive visitation that her parents supervised.

¶13. Following an ex parte emergency hearing, on February 5, 2024, the chancery court entered a temporary emergency order granting Blake temporary emergency custody, temporarily suspending Blake's child support payments and appointing a guardian ad litem ("GAL"), Attorney Will Loden, because of the allegations of abuse and/or neglect.

¶14. Dannah obtained counsel and filed her answer to the complaint on March 1, 2024.

5

¶15.    On April 24, 2024, the court issued an agreed temporary order that maintained a temporary custody arrangement with Blake and Dannah having week-on, week-off visitation until the hearing, with Dannah's visitation being supervised by her parents. The mutually agreed meeting location to exchange the children was in Champaign, Illinois.

¶16.    On August 6, 2024, Dannah filed a "Counter-Complaint for Modification and Other Relief," asking that Blake be required to pay one-half of the children's school expenses and extracurricular activities. She also asked that Blake be required to pay for an automobile and automobile-related expenses when the children reach driving age and that she be awarded attorney's fees and court costs.

¶17.    On August 26, 2024, the GAL submitted a report to the court, recommending that Blake be granted physical custody of the children and that Dannah receive liberal visitation. The GAL also recommended that each parent have reasonable telephonic communication with the children.

### The Hearing

¶18.    On August 20-21, 2024, the court held a hearing on the complaint for modification. The following people testified: Dannah, Kyle, Virginia Feathers, Priscilla Holland, Blake, and Jennifer Brents.

### Dannah's Testimony

¶19.    Blake called Dannah as an adverse witness. Dannah confirmed that she was twenty-seven years old, that she lived in Pontotoc, Mississippi, in a home owned by her mother, and

6

that she had been employed part-time for approximately seven months as a dispatcher at Holy Keys Locksmith. According to her Rule 8.05 financial statement, she earned $800 per month. UCCR 8.05. She also confirmed that she shared two children with Blake and that her oldest child, from a previous relationship, was deaf, and his monthly disability payment was $940 per month.

¶20. Dannah testified that she dated Kyle from October 23, 2023, until late January 2024. During this time, she would visit Kyle at Virginia's home late in the evening, and she would sometimes take her children with her. Dannah alleged that the children's bedtime was normally between 9:00 p.m. and 10:00 p.m. During the relationship, Dannah testified that Kyle spent the night with her only one to two times per week, totaling as many as thirty-two occasions, and most often, the children were present.

¶21. Dannah also testified that Kyle did not sleep in the bed with her and her children, but she later conceded that one night while staying at her parents' residence, Kyle slept in the bed with her and her children. She explained that although she did not want him in the bed, he had been drinking and had become argumentative. To avoid waking anyone, she permitted him to sleep with them.

¶22. Dannah further testified that in January 2024, she discovered that Kyle had been seeing another woman. Dannah admitted that she and Kyle appeared in a sex video that was posted on her Snapchat social media account. Dannah maintained that she was under the influence of an excessive amount of Klonopin and that Kyle did not have her consent to

7

record their sexual relations or to post the video on Snapchat. Dannah testified that after this incident, she stopped using Klonopin.

¶23.    Dannah said that Kyle's mother sent Blake the sex video. After viewing it, Blake sent Dannah a text message, criticizing her actions. Dannah stated that her response did not reflect her true feelings, but she responded out of anger and lashed out because she believed Blake sent the video to her mother and grandmother. She admitted that her reply messages did not express any remorse or indicate that the recording was not consensual. The text messages were entered into evidence. Additionally, a still photograph taken from the sex video was introduced into evidence, under seal. Dannah also testified that she was currently attending counseling once a month at Right Track Medical Group.

**Kyle's Testimony**

¶24.    Kyle testified next. He said that Dannah became upset after she went through his phone and learned that he was seeing other women, and he said that Dannah took twelve Klonopin pills. He also testified that it was not Dannah's first time consuming more than her prescribed dosage of Klonopin. Kyle claimed this happened approximately six other times, two times that he witnessed, and the other times he suspected it based on her demeanor and appearance. Kyle testified that Dannah traveled to Batesville to "meet another man for sex in order to get back at him for seeing other women." While Dannah was away, Kyle said he watched Dannah's children. When Dannah returned, they made the sex video, which he recorded at Dannah's request. The video was approximately ten seconds long. Kyle denied

8

posting the video on social media.

¶25.    Kyle also testified that Dannah tried to jump out of his moving vehicle when he was traveling approximately forty-five miles per hour.  Kyle said that when they arrived at her parents' house, Dannah fought him because she did not want to go inside.  Kyle restrained Dannah, trying to calm her down, and in response, Dannah bit and scratched him.  Once inside the home, Dannah grabbed a kitchen knife and barricaded herself in the hallway bathroom, screaming, "You can't stop me."  He also testified that the children were inside the home while she was threatening suicide, which TFH witnessed.

¶26.    Kyle and Dannah contradicted each other in their testimony in several areas.  Kyle testified that he stayed with Dannah three to four nights per week.  Further, he testified that the children slept in the bed with him and Dannah a total of twelve to fifteen times.  Moreover, he testified that he had sex with Dannah while the children were in bed.  Kyle also disputed Dannah's testimony regarding the children's bedtimes, testifying that they did not have a regular sleep schedule.

**Virginia's Testimony**

¶27.    Virginia Feathers, Kyle's mother, then testified about Dannah's demeanor on another occasion when she came to her house, referring to Dannah as "acting crazy" and using a "steady stream of profanity."  Virginia also stated that the children were not properly supervised and that one time Dannah brought them to her house around 10:30 p.m.  Finally, Virginia confirmed that she is the person who shared Dannah and Kyle's sex video with

9

Blake, as she had already discussed her concerns with Blake about the children being in Dannah's care.

**Priscilla's Testimony**

¶28.    Priscilla Holland, Blake's mother, testified regarding the home life of the children while in Blake's care. She said she visits Blake's home every other week. Blake lives on about sixty acres in the countryside, where they have horses and dogs, and the children enjoy being outdoors on the property. She also stated that the children have a structured schedule, were eating a healthier diet, and slept in their own beds. She stated that the children have shifted from "wild" behavior to demonstrating much better behavior. Blake was also engaged, and his fiancée had created a bond with the children. The children's immunization records were somewhat behind and had to be updated before they could enroll in Michigan schools. The immunization records were entered into evidence.

**Blake's Testimony**

¶29.    Blake testified that he was twenty-five years old and moved to Rapid River, Michigan, on December 6, 2023, where he works for Canadian National Railroad as a signal maintainer. He has been employed with this company for two-and-a-half years. Blake testified that as long as he works eight hours per day, he has a flexible schedule, and during the month that he was on call, he had adequate childcare. The children could be at daycare and school while he worked. He testified that Dannah confirmed in a text message that the children slept with her and Kyle. Blake discussed his observations of the children, noting that they were now

more well-mannered, referring to adults as "sir" and "ma'am." He also testified that the children were developmentally delayed when he first obtained custody of them, and the oldest child's delay was so severe that the child almost needed the assistance of a developmental delay specialist.[2] However, no medical information was offered into evidence to support any of this testimony.

¶30.   Blake testified that he tested positive for marijuana, and the court was concerned. However, Blake claims that he does not use marijuana and that it may have resulted from using hemp lotion or being around frequent recreational use of marijuana in Michigan. Further, he stated that he was regularly drug tested by his employer and that each time his results were negative.

**Jennifer's Testimony**

¶31.   Jennifer Brents, Dannah's mother, testified that she worked as a registered nurse. Jennifer testified that she saw the children daily and that Dannah and the children spent the night at her home several times per week. Jennifer testified that one morning after they spent the night, when she went to wake up Dannah and the children, she saw Kyle in the bed with Dannah and the children. She stated that he was fully clothed, wearing a t-shirt and pants.

¶32.   Jennifer stated that when the sex video was disseminated, but prior to Dannah's suicide attempt, her niece called her about Dannah's well-being. Jennifer testified that based

---

[2] Dannah corroborated that TFH's developmental delay was because of the oldest child's disability, being deaf and nonverbal.

on Dannah's demeanor when she arrived at Dannah's home, she became concerned that Dannah was "under the influence of some substance." Jennifer testified that the children were unaware of Dannah's attempts at suicide because the children were kept in the bedroom. Jennifer also corroborated previous testimony about Dannah's suicide attempts, Dannah's scratching Kyle, and Dannah's two-day stay at the behavioral health center. Jennifer testified that Dannah has been on anxiety and depression medication for "her entire life." She also stated that all of Dannah's children have a close relationship with each other. Dannah was residing with Jennifer.

¶33. At the end of the hearing, the Court indicated that the GAL would file his response in a week, and counsel had two days thereafter to file any written objection.

**The Court's Ruling**

¶34. On September 20, 2024, the court reconvened by telephone to announce to the parties its ruling from the bench, finding that Blake had proved by more than a preponderance of the evidence that there had been a substantial and material change in circumstances in Dannah's home. The court further found that the change had an adverse effect on the children, and it was in the children's best interests that the court modify the previous agreed order of child custody. After reviewing each of the *Albright* factors,[3] the court granted Blake "primary"

---

[3] The *Albright* factors considered are the age, health, and sex of the child; "a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness

physical custody, with both parents maintaining joint legal custody.

¶35. The court also found that it would be in the best interests of the children that Dannah have supervised visitation in the presence of her mother, Jennifer Brents, or her grandmother, Sheila Walls, "until such time as the Defendant provides proof via a sworn deposition administered through the course of this proceeding or via sworn testimony, and evidentiary proof from a medical provider, establishing to the Court's satisfaction that her mental health is stable and that she poses no threat to the minor children." The court also ordered that Dannah be granted the following visitation, which is also subject to the supervision provisions:

> a. Christmas visitation. Defendant shall have seven days of visitation at Christmas each and every year from 2:00 PM on December 26 until 2:00 PM on January 2.
> b. Summer visitation. Defendant shall have visitation in the summertime beginning on the first Sunday after school releases for summer break until the Saturday preceding the children's school resumes each year. The parties shall use the school schedule of the local area in Michigan for determining dates of summer visitation and spring visitation.
> c. Spring visitation. Defendant shall have visitation with the minor children each and every spring visitation from 2:00 PM the day next following the children's release from school for spring break until 2:00 PM on the day preceding the children's return to school from spring break.
> d. Weekend visitation. Defendant shall have visitation with the minor children on one weekend per month from 5:00 PM on Friday until 5:00 PM on the following Sunday provided however that all such weekend visitation shall be exercised within 50 miles of Plaintiff's home in the state of Michigan and

---

of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship." *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

also only if the Defendant gives a 30 days notice to Plaintiff on when she intends to exercise a weekend of visitation.

The Court also ordered Dannah to pay $160 per month in child support and dismissed Dannah's counter-claim for modification and other relief without prejudice.

¶36. Dannah appeals, contending that (1) the chancellor erred by finding a material change in circumstances adverse to the children warranting a modification of physical custody, (2) the chancellor erred by failing to apply the preference for keeping siblings together, (3) because the custody award should be reversed, the Court should reverse all other aspects of the judgment, and (4) alternatively, the chancellor erred by ordering supervised visitation against the GAL's recommendation.

## STANDARD OF REVIEW

¶37. We set out our standard of review as to changes in custody in *Lambert v. Lambert*, 872 So. 2d 679, 683-84 (¶18) (Miss. Ct. App. 2003):

> Our standard of review of the decision of a chancellor is limited and we will reverse only where the decision is manifestly wrong or clearly erroneous or the chancellor has applied an erroneous legal standard. *Creel v. Cornacchione*, 831 So. 2d 1179, 1183 (¶14) (Miss. Ct. App. 2002).

¶38. "This Court will not reverse the chancellor's custody decision unless the chancellor abused his discretion, was manifestly wrong, or clearly erroneous, or applied an erroneous legal standard." *McLellan v. McLellan*, 397 So. 3d 860, 867 (¶25) (Miss. Ct. App. 2024) (quoting *Smith v. Bellville*, 301 So. 3d 678, 682 (¶8) (Miss. Ct. App. 2020)). "So long as there is substantial evidence in the record that, if found credible by the chancellor, would

14

provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Id*. (quoting *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004)). In other words, the issue is not whether this Court "agrees with the chancellor's ruling" but only whether "substantial evidence" supports the chancellor's ruling. *Id*. We review questions of law de novo. *Id*. (quoting *Vassar v. Vassar*, 228 So. 3d 367, 374 (¶23) (Miss. Ct. App. 2017)).

## DISCUSSION

I. **Whether the chancellor erred in finding a material change in circumstances that adversely affected the children and that modification was in their best interests.**

¶39. Dannah argues that the chancellor erred by finding a material change in circumstances adverse to the children, warranting a modification of physical custody. Specifically, she contends that the children suffered no harm and that *Riley v. Doerner*, 677 So. 2d 740 (Miss. 1996), does not apply. Alternatively, she maintains that any changes in the circumstances were not material.

¶40. Blake, however, contends that there was a substantial and material change in circumstances adversely affecting the minor children that supported a custody modification. Further, he maintains, this change in custody was in the best interests of the minor children, and he asserts that the reasoning of *Riley* supported the Court's opinion.

*A. Material Change in Circumstances Adversely Affecting Children*

¶41. "A modification of custody requires the noncustodial parent to prove: (1) that a

15

material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child." *Stuckey v. Stuckey*, 341 So. 3d 1030, 1036 (¶15) (Miss. Ct. App. 2022) (quoting *Powell v. Powell*, 976 So. 2d 358, 361 (¶11) (Miss. Ct. App. 2008)). In determining whether a material change in circumstances has occurred, the chancery court "must consider the totality of the circumstances." *Id*. "Even though under the totality of the circumstances a change has occurred, the court must separately and affirmatively determine that this change is one which adversely affects the children." *Id*. (quoting *Bredemeier v. Jackson*, 689 So. 2d 770, 775 (Miss. 1997)). "Any change in custody must be predicated on the conduct of the custodial parent that *poses a danger to the mental or emotional health of the child*." *Id*. (emphasis added) (quoting *Sullivan v. Beason*, 37 So. 3d 706, 708 (¶8) (Miss. Ct. App. 2010)). Furthermore, "the party seeking the modification of custody bears the burden of proving by a preponderance of the evidence that a material change in circumstances has occurred in the custodial home." *Id*. (quoting *Mabus v. Mabus*, 847 So. 2d 815, 818 (¶8) (Miss. 2003)). Substantial deference is given to a chancellor's findings, as the chancellor "has the ultimate discretion to weigh the evidence the way he sees fit in determining where the child's best interest lies." *Id*. at (¶16) (quoting *O'Briant v. O'Briant*, 99 So. 3d 802, 806-07 (¶19) (Miss. Ct. App. 2012)).

¶42.    In this recent, factually similar case, *Stuckey*, we affirmed a chancery court's finding of material changes in circumstances that adversely affected a ten-year-old child, S.S.

16

*Stuckey*, 341 So. 3d at 1038 (¶20). There, the court found that after her divorce, S.S.'s mother developed a relationship with a then-married man, Steelman, who had pled guilty to a DUI conviction. *Id*. The child was present during this man's excessive use of alcohol. *Id*. The child's mother had tested positive for unprescribed prescription medication. *Id.* at 1037 (¶18). The child had to hide during Steelman's angry outbursts and when Steelman and her mother fought. *Id.* The child missed a significant amount of school and suffered health issues, which resolved when she moved in with her father. *Id.* at 1038 (¶20). The chancery court found these facts established a material change that adversely affected the child. *Id*. at 1037 (¶17). On appeal, we cited all these factual findings by the chancellor and found no error, stating:

> We conclude the record contains sufficient evidentiary support for the chancellor's findings. Further, in viewing the totality of the circumstances presented, we cannot say the chancellor abused his discretion or manifestly erred in determining that an adverse material change in circumstances had occurred in the custodial home with regard to S.S.

*Id*. at 1038 (¶20).

¶43. In the instant case, the chancery court first determined that a material change in circumstances had occurred in Dannah's home based on evidence that Dannah attempted to jump from a moving vehicle, that she locked herself in a bathroom and tried to commit suicide after excessive drug use, and that she had to be transported from the home by ambulance for hospitalization. Although they were in another room, the children were present in the home when this happened. Further, the court found Dannah had physically

17

attacked her boyfriend, Kyle, biting and scratching him. The court also found that Dannah engaged in outrageous conduct while abusing her prescription medication. This conduct included the recording and public posting of the video of her and Kyle having sexual relations, although the evidence did not establish who, Dannah or Kyle, initiated or posted the recording. The court further found that Dannah allowed the children to sleep in the same bed with her and Kyle, including at times when they were having sex.

¶44. The court next found that this change in Dannah and the children's circumstances adversely affected the children. The court noted that the children had no routine sleep schedule and that Dannah often kept them out late at the house of Kyle's mother. They suffered developmental delays demonstrated by their being behind on their academic benchmarks, "to the point of almost needing intervention by a specialist." They were behind on their immunizations, causing issues with their daycare enrollment. Moreover, they demonstrated wild and ill-mannered behavior.

¶45. As we held in *Stuckey*, the record here contains sufficient evidentiary support for these findings. Viewing the totality of the circumstances presented, we cannot say the chancellor abused his discretion or manifestly erred in determining that a material change in circumstances had occurred in the custodial home that adversely affected these children, warranting a modification of the custody order.

B.     *Application of Riley v. Doerner*

¶46. In the alternative, the chancery court also held:

18

> Even if the court were not to find that these facts constituted an adverse effect on the minor children, the court would find that the alternative test for modification of child custody, as set forth in the case of *Riley v. Doerner* would apply.

In *Riley*, Billy was adjudicated to be the father of an eight-year-old child, but the mother, Connie, had custody of the child. *Riley*, 677 So. 2d at 742. Billy filed a motion to modify the custody order, and after a hearing, the chancery court "strongly believed" that it would be in the child's best interest to live with her father, given the totality of circumstances (i.e., Connie's frequent moves, a succession of live-in boyfriends, use of drugs, etc.). *Id.* However, the chancellor found he could not modify custody because he could find no adverse effect on the child. *Id.* But the court ordered both parties to submit to drug tests, and when Connie failed, the court transferred custody of the child to Billy. *Id.* This Court affirmed the chancery court's decision, and Connie filed a petition for writ of certiorari, which the Mississippi Supreme Court granted. *Id.* at 743. After examining the record, the Court held:

> Where a child living in a custodial environment clearly adverse to the child's best interest, somehow appears to remain unscarred by his or her surroundings, the chancellor is not precluded from removing the child for placement in a healthier environment. . . . Accordingly, in this case, once the chancellor determined that Connie's home was the site of illegal drug use, as well as other behavior adverse to [the child's] welfare, and determined that Billy's circumstances had improved such that he was able to provide a good home for [the child], it was within his discretion to transfer her custody from Connie to Billy.

*Id*. at 744.

¶47. In *Stuckey*, we quoted *Riley*, explaining:

19

The test we have devised for custody modification need not be applied so rigidly, nor in such a formalistic manner so as to preclude the chancellor from rendering a decision appropriate to the facts of an individual case. In particular, it should not thwart the chancellor from transferring custody of a child from one parent to another when, in the chancellor's judgment, the child's welfare would be best served by such transfer.

*Stuckey*, 341 So. 3d at 1036-37 (¶15) (quoting *Riley*, 677 So. 2d at 745). We have also held that "[t]he chancellor [is] not required to wait for proof that [a custodial parent's] actions had adversely affected [the child]." *Ruth v. Burchfield*, 23 So. 3d 600, 606-07 (¶20) (Miss. Ct. App. 2009).

¶48. In the case at hand, the chancellor considered the "tender years" of the children, which made it difficult to determine the full extent of the adverse effects Dannah's behavior might have on them. But the court found it could not be compelled to leave the children in her care when she had abused her prescription medication, allowed the children to sleep in the bed with her sexual partner on multiple occasions, allowed them to miss immunization due dates, and attempted suicide in the children's presence. We agree that it was within the chancery court's discretion to find that the environment Dannah provided was adverse to the children's best interests and, under *Riley*, modified custody accordingly.

¶49. In summary, from our review of the record, we find that the chancellor did not apply an erroneous legal standard, nor were his findings manifestly wrong or clearly erroneous. Rather, the chancellor correctly determined that a material change in circumstances had occurred in Dannah's living situation and behavior and that the change adversely affected the children. Viewing the totality of the circumstances, there was substantial evidence that

20

supported the chancellor's findings that modification of the child custody order was in the best interests of the children. Accordingly, we affirm the chancellor's decision to modify the custody agreement and grant the father sole physical custody of the children.

**II.     Whether the chancellor erred by failing to apply the preference for keeping siblings together.**

¶50.    Dannah contends that the chancellor erred when he failed to keep the parties' two children and their half-brother together, arguing that the law requires a preference for keeping siblings together. Blake contends that the chancellor was not obligated to keep his children and their half-sibling together and that Dannah failed to show any harm the children would suffer if separated from their half-brother.

¶51.    Both parties agree, and the record reflects, that the chancellor did not include or refer to the children's relationship with their half-brother in his detailed bench ruling or later in the judgment. Dannah failed to seek any relief from that ruling or judgment or raise this issue to the chancery court before she appealed. Accordingly, because the chancery court was not presented with this issue, it is waived on appeal. *Embrey v. Young*, 337 So. 3d 247, 259 (¶43) (Miss. Ct. App. 2021).

¶52.    Notwithstanding the waiver, no rule requires chancellors to keep siblings together, although there is a preference. *Riley v. Heisinger*, 302 So. 3d 1243, 1257 (¶60) (Miss. Ct. App. 2020). This reasoning applies in cases of half-siblings as well. *Kimbrough v. Kimbrough*, 76 So. 3d 715, 726 (¶¶63-64) (Miss. Ct. App. 2011). In *Kimbrough*, the chancellor held that it was in the best interest of a five-year-old to award the father custody,

21

despite the fact that the child had lived with her mother and her eleven-year-old half-sibling all her life. *Id*. at (¶63). Similarly, in *Heisinger*, we found no error in a chancellor's ruling that placed a three-year-old child with her father and separated her from her fifteen-year-old stepbrother and her half-siblings (a four-year-old and a two-year-old), despite testimony that they were close. *Heisinger*, 302 So. 3d at 1252, 1257-58 (¶¶33, 61). In a more recent case, where change of custody of a child would result in her separation from her older half-sibling, we stated, "[i]mportantly, there is no hard and fast rule that the best interest of siblings will be served by keeping them together." *Tilley v. Gibbs*, 387 So. 3d 64, 80 (¶37) (Miss. Ct. App. 2024). "[T]he separation of siblings should not override a child's best interest." *McLellan*, 397 So. 3d at 867-68 (¶28) (quoting *Owens v. Owens*, 950 So. 2d 202, 212 (¶35) (Miss. Ct. App. 2006)).

¶53. In the instant case, the chancellor acknowledged that the parties' two children had an older half-sibling, LB. There was little testimony about the children's relationship, other than Dannah's testimony that she was teaching ABH (age one) and TFH (age four) sign language so they could communicate with LB, who was deaf. Moreover, there was no testimony or evidence presented that demonstrated that separating these half-siblings would harm them. Whether the closeness of the relationship was a factor to consider, given these circumstances, was for the chancery court to determine. "The chancellor must address each *Albright* factor that is applicable to the case." *Heisinger*, 302 So. 3d at 1255 (¶46). Moreover, the separation of siblings is not a separate *Albright* factor but one factor that the

22

chancellor may consider along with the best interest of the child. *Latham v. Latham*, 357 So. 3d 1157, 1164 (¶23) (Miss. Ct. App. 2023).

¶54. Considering the chancellor's full and detailed bench opinion, we cannot find any abuse of discretion in the court's modifying custody between Dannah and Blake, despite the children's separation from their half-brother, especially in light of the substantial facts supporting the court's finding that the change was in their best interests.

### III. Whether the chancellor erred in ordering supervised visitation despite the GAL's recommendation.

¶55. Dannah contends that if her other claims fail, then alternatively, the chancellor erred by ordering supervised visitation contrary to the GAL's recommendation of "liberal visitation." Blake responds that the chancellor acted within his discretion and properly required supervised visitation despite the GAL's recommendation.

¶56. A chancellor is required by law to appoint a GAL in any child custody case in which there is a "legitimate" charge of abuse or neglect, i.e., an allegation of abuse or neglect that appears to the court to have a "sufficient factual basis." *Barbaro v. Smith*, 282 So. 3d 578, 600 (¶100) (Miss. Ct. App. 2019) (quoting *Carter v. Carter*, 204 So. 3d 747, 758-59 (¶¶50-52) (Miss. 2016)); *see* Miss. Code Ann. §§ 93-5-23 (Rev. 2013),[4] 93-11-65 (Rev.

---

[4] Section 93-5-23 of the statutes governing domestic relations provides in part:

The court may investigate, hear and make a determination in a custody action when a charge of abuse and/or neglect arises in the course of a custody action as provided in Section 43-21-151, and in such cases the court shall appoint a guardian ad litem for the child as provided under Section 43-21-121, who

2015).[5] In such cases, "there is no requirement that the chancellor defer to the findings of the guardian ad litem. Such a rule would intrude on the authority of the chancellor to make findings of fact and to apply the law to those facts." *Barbaro*, 282 So. 3d at 600 (¶100) (quoting *S.N.C. v. J.R.D. Jr.*, 755 So. 2d 1077, 1082 (¶17) (Miss. 2000)). However, the Mississippi Supreme Court has held that "when a chancellor's ruling is contrary to the recommendation of a statutorily required guardian ad litem, the reasons for not adopting the guardian ad litem's recommendation shall be stated by the court in the findings of fact and conclusions of law." *Id*. (quoting *S.N.C.*, 755 So. 2d at 1082 (¶18)).

¶57. The Mississippi Supreme Court has addressed when a chancellor may impose restrictions on visitation in *Griffin v. Griffin*, 237 So. 3d 743, 747 (¶13) (Miss. 2018):

> A noncustodial parent is presumptively entitled to visitation. *Cox v. Mounds*, 490 So. 2d 866, 870 (Miss. 1986). But we have recognized that presumption can be overcome when "substantial evidence" justifies doing so. *Id*.; *cf. also Newsom v. Newsom*, 557 So. 2d 511, 517 (Miss. 1990) (holding "that the chancery court has the power to restrict visitation in circumstances which present an appreciable danger of hazard cognizable in our law"). Indeed, while a chancellor must "always be[] attentive to the rights of the

---

shall be an attorney. . . .

[5] Section 93-11-65(4) provides in part:

(4) When a charge of abuse or neglect of a child first arises in the course of a custody or maintenance action pending in the chancery court pursuant to this section, the chancery court may proceed with the investigation, hearing and determination. . . . The proceedings in chancery court on the abuse or neglect charge shall be confidential in the same manner as provided in youth court proceedings, and the chancery court shall appoint a guardian ad litem in such cases, as provided under Section 43-21-121 for youth court proceedings, who shall be an attorney. . . .

24

non-custodial parent" and "recogniz[e] the need to maintain a healthy, loving relationship between the non-custodial parent and his child," the "paramount concern" in visitation is the best interest of the child. *Harrington* [*v. Harrington*], 648 So. 2d [543,] 545 [(Miss. 1994)].

¶58. "The chancellor is charged with the responsibility to protect the children and determine what visitation is in their best interest," and "great deference is given to the chancellor's decision on these matters." *Newsom*, 557 So. 2d at 517 (quoting *Spain v. Holland*, 483 So. 2d 318 (Miss. 1986)).

¶59. In the case at hand, the GAL recommended that Dannah have liberal visitation with the children. However, the chancellor departed from that recommendation and found that Dannah's visitation, though liberal, should be supervised by Jennifer Brents, Dannah's mother, or Sheila Walls, Dannah's grandmother. The court stated:

> The [c]ourt respects the opinion and position of the guardian ad litem, but finds that Dannah's visitation should be supervised at the current time, given the concerns raised hereinabove with regards to Dannah's mental health and the threat it may pose to the minor children, particularly in light of one suicide attempt being in the home where both minor children were present. . . . Accordingly, all visitation . . . shall be supervised by her mother, Jennifer Brents, or her grandmother, Sheila Walls, at all times until Dannah provides proof to the [c]ourt via a sworn deposition administered through the course of this proceeding or via sworn testimony or sworn affidavit from a medical provider that establishes, to the [c]ourt's satisfaction, that her mental health is stable and that she poses no threat to the minor children.

¶60. Although the GAL made a recommendation under *Barbaro*, the chancellor was not required to adopt it, as doing so would improperly intrude on the chancellor's authority. *See Barbaro*, 282 So. 3d at 600 (¶100). Here, the chancellor satisfied his statutory obligation by explaining in his findings why he declined to follow the GAL's recommendation. In making

25

custody and visitation determinations, the chancellor must act in the best interests of the children, which is his "paramount concern." Here, the chancellor found that Dannah's mental health history, specifically her suicide attempt in the presence of the children, made unsupervised visitation a potential threat to their safety.

¶61. Further, the record reflects that the restriction on Dannah's visitation is temporary. The chancellor limited supervised visitation only until Dannah submits "sworn deposition, sworn testimony, or sworn affidavit" from a medical provider establishing that her mental health is stable and that she no longer poses a threat to the minor children. Considering the totality of the circumstances, we find this restriction reasonable.

¶62. Accordingly, we find no clear error or abuse of discretion in the chancellor's decision to require Dannah's visitation be supervised.

### IV. Whether the remaining portions of the judgment must be reversed.

¶63. Dannah argues that this Court should reverse the chancery court's judgment and return custody of the children to her, then those portions of the judgment dealing with visitation and child support should be vacated. Because we affirm the chancery court's judgment of modification, Dannah fails to show that other portions of the judgment need to be reversed.

### CONCLUSION

¶64. Because we find no abuse of discretion or error in applying the law, we affirm the chancery court's judgment of modification.

¶65. **AFFIRMED.**

26

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**